703 F.2d 98
 31 Fair Empl.Prac.Cas. 877,
31 Empl. Prac. Dec. P 33,544
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,
v.
KIMBROUGH INVESTMENT COMPANY, d/b/a Sheraton Biloxi Motor
Inn, Defendant-Appellee.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,
v.
KIMBROUGH INVESTMENT COMPANY d/b/a Sheraton-Biloxi Motor
Inn, Defendant-Appellant.
 Nos. 81-4429, 82-4043.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 11, 1983.
Dissenting Opinion April 1, 1983.
 
 Joseph Ray Terry, Jr., Memphis, Tenn., for E.E.O.C. in No. 81-4429.
 Mark S. Flynn, App. Div., E.E.O.C., Washington, D.C., for E.E.O.C.
 Michael Farrell, Jackson, Miss., for Kimbrough Inv. Co.
 Appeals from the United States District Court for the Southern District of Mississippi.
 Before CLARK, Chief Judge, RUBIN and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge.
 
 
 1
 The Equal Employment Opportunity Commission charges racial discrimination in this class action suit as representative of a specified class of hotel employees. The EEOC appeals the denial of relief in the court below, and the hotel operator appeals the denial of its attorneys' fees claimed as prevailing party. We affirm the decision of the district court.
 
 BACKGROUND
 
 2
 The present cause of action began in 1973 when a discharged employee of the Biloxi Sheraton Motor Inn filed a race discrimination complaint with the Equal Employment Opportunity Commission (EEOC). While the EEOC found no reasonable cause to pursue the individual's charge, its investigation led the EEOC to believe that the hotel was engaged in unlawful racially discriminatory employment practices. The EEOC filed this suit in federal district court in September, 1975, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. The defendant, Kimbrough Investment Company, was the owner and operator of the Biloxi Sheraton at the time the suit was filed.[1]
 
 
 3
 In March, 1979, the district court certified the EEOC as representative of a class of all black employees of the Biloxi Sheraton since October 12, 1972 (180 days before the filing of the original complaint with the EEOC).[2] The parties agreed to a bench trial before a United States Magistrate. In August, 1981, the district court found that there was no prima facie evidence of racial discrimination based on the evidence presented. In the alternative, the court held that even if there was such a prima facie case, it was successfully rebutted by the employer. The court found no evidence that the employer's answers to the charges of racial disparity were a mere pretext for racial discrimination. The ultimate holding was that a claim for relief under Title VII had not been established. The cause was dismissed with prejudice.
 
 
 4
 The district court awarded court costs to the employer, but denied motions for attorneys' fees under both Title VII, 42 U.S.C. Sec. 2000e-5(k), and the Equal Access to Justice Act, 28 U.S.C. Sec. 2412. The EEOC appeals the finding of no discrimination, and the employer appeals the denial of attorneys' fees.
 
 SCOPE OF REVIEW
 
 5
 This is a disparate impact class action suit. Thus, no intent to discriminate need be shown. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977). The order of proof, however, follows the pattern established in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), a disparate treatment case. Johnson v. Uncle Ben's, Inc., 657 F.2d 750 (5th Cir.1981); Rivera v. City of Wichita Falls, 665 F.2d 531 (5th Cir.1982); Harrell v. Northern Elec. Co., 672 F.2d 444 (5th Cir.1982); Wheeler v. City of Columbus, Miss., 686 F.2d 1144 (5th Cir.1982). The plaintiff initially has the burden of showing a prima facie case of discrimination. If the plaintiff succeeds in this showing, the focus of attention shifts to the employer to persuade the court of the existence of a "legitimate business reason" by a preponderance of the evidence. Johnson v. Uncle Ben's, Inc., supra, 657 F.2d at 753. If the employer makes such a showing, the focus returns to the plaintiff to establish by a preponderance of the evidence that the employer's justification fails because effective and not too costly business alternatives are available which the employer can be forced to accept to eliminate discrimination. The "ultimate burden of persuading" Burdine, supra, 101 S.Ct. 1089, 1093, always rests on the plaintiff to show discrimination in violation of law.
 
 
 6
 The ultimate question of the existence of discrimination is a question of fact. Our power to alter a district court's findings under Fed.R.Civ.P. 52(a) is limited to those that are clearly erroneous. Pullman-Standard v. Swint, --- U.S. ----, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). With this standard in mind, we turn to the findings of fact before us. To evaluate the findings under the clearly erroneous standard, we have made a thorough review of the entire record.EVIDENCE OF DISCRIMINATION
 
 A. 1974-1977
 
 7
 We first examine the evidence of discrimination in the later years involved. On oral argument, the employer conceded the existence of a prima facie case of racial discrimination during the years 1974 through 1977. Therefore, the posture of the case as presented on appeal is to review the district court's conclusion that even if a prima facie case existed, it was effectively rebutted.
 
 
 8
 The basis of a prima facie case, according to the record, stemmed primarily from the employer's hiring procedures, which utilized a "folder system". When job seekers filled out applications for employment, they were asked to specify the positions for which they were applying. Banquet worker applications were placed in a "Banquet" folder, bellman applications in a "Bellman" file, and so on. Those who offered to accept "anything" offered were placed, predictably, in an "Anything" folder. Applications in the Anything folder were rarely, if ever, given additional review. One of the EEOC's main charges was that this Anything folder discriminated against minority employees[3] in both their initial job assignments and their chances for subsequent promotions.
 
 Yet the district court found that
 
 9
 [i]t has been the long standing policy of the Defendant to maintain a folder placement system when correlating and referring to the employment applications. This policy is uniformly followed by the defendant and applied equally to all persons regardless of race. Title VII does not require an employer to announce vacancies or to consider all applicants, black and white, for all jobs. Louis [Lewis] v. Tobacco Workers International Union, 557 F.2d 1135 (4th Cir.1978), cert. denied, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 56 (1979); Furnco Construction Corp. v. Waters, [438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ]. Although the record indicates that the folder system may not be the best system which Defendant could have utilized, the facts fail to indicate that blacks were treated any differently than whites under the folder system.... [T]here has been no showing made ... that the folder system has a disparate impact on black applicants or black employees moving from one position to another. (Emphasis added).
 
 
 10
 The district court concluded no prima facie case had been established. On oral argument, however, the company conceded the showing of a prima facie case, giving as its reason its erroneous belief that the district court had found there was a prima facie case. The district court, however, insured the validity of its ultimate conclusion by specifically finding that even if a prima facie case had been shown, the employer had adequately rebutted it. Our review of the record shows ample evidence to support this conclusion. Blacks were employed in almost every area of the hotel's operations. There were blacks as heads of departments and in other well-paying jobs. The government's own exhibits, although acknowledged by all parties to be deficient in some other respects, showed that applications were in rough racial accord to the work force profile of the general Biloxi population. Hirings were in rough accord with the racial balance of applicants.
 
 
 11
 Although the hotel does seem to have had some departments that were predominantly black, as the employer conceded on oral argument during this appeal, there is sufficient and credible evidence in the record to show that such disparity has been the result of factors other than discrimination. For example, the court below considered the evidence that there were no black employees in the accounting department. It looked back to the applications made during that time and found that only eight blacks, as opposed to 142 whites, even applied for jobs in the "accounting and general" department from 1975 to 1979. Further, census figures show that only 3.6% of the area's managerial and administrative work force is black. Finally, the plaintiff failed to produce a single class member who unsuccessfully applied for a job in this department. We agree with the district court's holding that these facts simply do not establish that there was racial discrimination in violation of law.
 
 
 12
 In short, the employer proved that its employment practices were rooted in "legitimate business reasons." Johnson v. Uncle Ben's, Inc., supra, 657 F.2d at 753. The EEOC failed to present any evidence that the hotel's practices were a "masking" of discrimination. McDonnell Douglas Corporation v. Green, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). With this in mind, we find the district court's ultimate holding of no violation of Title VII in these later years is not clearly erroneous.
 
 B. 1971-1973
 
 13
 During the first years of the hotel's operation, 1971-1973,[4] the employer denies the existence of even a prima facie case of discriminatory impact. The district court found that no such prima facie case was proved, holding that there was therefore no cognizable claim under Title VII. We affirm this part of the lower court's ruling, as well.
 
 
 14
 A full review of the record shows that the plaintiff's evidence regarding these early years is garbled and sketchy, and falls far short of establishing a prima facie case. Personnel records are incomplete. They do not give an authoritative racial breakdown of the hotel's personnel. They do not give an accurate racial breakdown of job applicants during that period, even though hotel managers testified that employment application forms had such information on them during these early years. The EEOC's proof for these early years seems to exist chiefly in the testimony of a few early employees of the hotel who testified that they never saw any black faces in certain departments.
 
 
 15
 This testimony is purportedly backed up by statistical evidence, but we find the statistics to be so riddled with inaccuracies that we cannot fault the court below for giving those statistics "no weight" and assigning them "no probative value." The statistics purported to be complete employment statistics, yet they were shown in the record to have skipped over many employees and applicants. They purported to represent a racial breakdown of employees, yet the paralegal who prepared the breakdown (under the direction of EEOC attorneys) admittedly categorized any "unknown" employee as white. This both masked and distorted the true racial picture of the hotel, since many of the employees were not racially identifiable from the hotel's records.
 
 
 16
 Furthermore, the records were incomplete in that they covered only new hires into the hotel and ignored the promotions that took place once minorities were hired. At one point, for example, the statistics showed no black department heads while the record clearly established that there were two. Since both had been promoted into those jobs, the government's statistics failed to acknowledge their existence. Although we recognize that statistics can play an important role, even the fully persuasive role, in establishing a prima facie case of Title VII discrimination, see Teamsters, supra, 431 U.S. at 339-40, 97 S.Ct. at 1856-57, 52 L.Ed.2d 396, and cases cited; Williams v. New Orleans Steamship Ass'n, 673 F.2d 742 (5th Cir.1982); Phillips v. Joint Legislative Committee on Performance and Expenditure Review of State of Mississippi, 637 F.2d 1014 (5th Cir.1981), cert. denied, 456 U.S. 960,971, 102 S.Ct. 2035, 2233, 72 L.Ed.2d 483, 845 (1982), we cannot fault the district court for affording the government's statistics "absolutely no weight in the case before us." See Smith v. Balkcom, 671 F.2d 858 (5th Cir.1982), modifying 660 F.2d 573 (5th Cir. 1981), cert. denied, ---U.S. ----, 103 S.Ct. 181, 74 L.E.d.2d 148 (1982).
 
 
 17
 Without such statistical evidence, we find no remaining basis by which a factfinder could find a prima facie case of racial discrimination. It is not for us as an appellate court to investigate or to judge de novo if the employer was discriminating against racial minorities. Swint, supra. We can review only the record before us. On this record it was not clear error for the district court to find that there was no prima facie violation of Title VII in 1971-73.
 
 ATTORNEYS' FEES
 
 18
 Under Section 706(k) of Title VII, 42 U.S.C. Sec. 2000e-5(k), a prevailing defendant can recover attorneys' fees in a case brought by the government if the action was unreasonable, frivolous, meritless, or vexatious. Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). The district court in the case before us awarded court costs to the employer as the prevailing party, but denied an award of attorneys fees. The employer charges that this denial was an abuse of the district court's discretion. We find no such abuse of discretion.
 
 
 19
 This action grew out of a routine investigation of a fired worker's charge of racial discrimination. The investigation showed a potential for unlawful discrimination. Indeed, the employer conceded during oral argument that a prima facie case existed for some of the years in question. This trial was held only after the government's attempts to settle the case failed. The employer's own offer of settlement through adoption of an affirmative action plan, in the words of the district court, "suggested the need for some steps to correct racial imbalance in certain aspects of its work force." The employer argues that the EEOC's case was brought vexatiously because it used flawed and misleading statistics in its trial exhibits. We recognize that the EEOC used statistical evidence that on its face in some measure lacked probative value. But some testimony and some analysis of hiring practices was valid probative evidence. We cannot conclude the case was vexatious.
 
 
 20
 Alternatively, the employer urges attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. Sec. 2412. This statute, however, applies only to claims for attorneys' fees when no other specific statute deals with an award of attorneys' fees against the government. Since Title VII has an explicit attorneys' fees provision in section 706(k), which was applied in this case as set out above, the district court was correct in finding that the attorneys' fees provisions of the Equal Access to Justice Act are not applicable in this case.
 
 
 21
 AFFIRMED.
 
 ALVIN B. RUBIN, Circuit Judge, dissenting:
 
 22
 While I respect my brethren's considered judgment, I take a different view not only of the record but, more important, of the standards for determining when Title VII condemns ostensibly neutral employment procedures that in practice have adverse racial impact. These views compel me to conclude that the majority not only departs from the criterion fixed by the Supreme Court for evaluating such practices but also endorses the attitude of a magistrate eager to ratify employer actions tainted by the effects condemned by the Equal Employment Opportunity Act. I, therefore, respectfully dissent.
 
 I.
 
 23
 This is a Title VII disparate impact case in the nature of a class action. The Equal Employment Opportunity Commission (EEOC) charged Kimbrough Investment Company, owner of the Sheraton Biloxi Motor Inn, with race discrimination in hiring, job assignments, promotion, and transfer. The EEOC also charged that the Sheraton maintained racially segregated job classifications and departments. The EEOC presented statistical evidence of segregated departments and testimony from several individuals who had been assigned jobs in historically black departments despite their preference for jobs in white departments.
 
 
 24
 The EEOC claimed that most hiring was by word-of-mouth, and that job openings were rarely advertised and never posted. It also claimed that there were no hiring standards and that the decision was an entirely subjective choice made by the hotel's department supervisors. Hiring only those who had access to information about vacancies, according to the Commission, meant that blacks never found out about openings in white departments. Subjective decisions by supervisors, all of whom except the head bellman and the banquet manager were white, presented particular opportunities for discrimination.[1]
 
 
 25
 The disparate impact claim focused on the Sheraton's "folder system" of hiring. Applicants were directed to a security guard. The guard told each applicant what positions were available and gave him an application form. The EEOC alleged that the guards "steered" blacks toward black departments by telling them that there were no jobs in white departments[2] or by suggesting that they list their choice of positions with a job in a black department first on the application.[3]
 
 
 26
 The completed application was forwarded to Kimbrough's executive secretary, who placed it into a folder marked with the job the applicant sought. If the applicant listed two or more jobs, the application was placed only in the folder for the first job listed. If the application stated that the applicant would accept any position, it was placed into the "anything" folder.
 
 
 27
 The EEOC charged that the "anything" folder contained a disproportionate number of black applicants' forms and that, when job openings occurred, the Sheraton never considered the applications in the "anything" folder.[4] These facts, the Commission claimed, established that the impact of the "anything" folder in particular and the folder system in general fell disproportionately on blacks.
 
 
 28
 The magistrate determined that the EEOC failed to prove a prima facie case. He stated as a conclusion of law:
 
 
 29
 [I]t has been the long standing policy of the Defendant to maintain a folder placement system when correlating [sic] and referring to the employment applications. This policy is uniformly followed by the Defendant and applied to all persons regardless of race.... Although the record indicates that the folder system may not be the best system which the Defendant could have utilized, the facts fail to indicate that blacks were treated any differently than whites under the folder system, or that the folder system had a disparate effect on blacks.[5]
 
 
 30
 The magistrate erred in framing the legal inquiry as whether white applicants were treated differently from blacks.[6] The sole issue in a disparate impact case is whether a facially neutral employment practice disproportionately disqualifies members of a protected group from employment. See Wheeler v. City of Columbus, 686 F.2d 1144, 1150 (5th Cir.1982) (Clark, C.J.)[7] Thus the question that should have been answered is whether in actual operation a practice under which all applicants were treated alike adversely affected the minority group. This is the way in which we have examined standards that, although applied to everyone alike, exclude all or disproportionate numbers of protected groups, such as diploma,[8] height and weight,[9] and testing requirements.[10]
 
 
 31
 The magistrate adverted to the real effect of the folder system: he found that the EEOC had not proved that the system does "in fact" discriminate. In this comment, he was clearly erroneous.[11] Indeed at oral argument the employer conceded that the EEOC had established a prima facie case of discrimination based on the hotel's maintenance of predominantly black departments. See majority op. at 101. Considering this merely counsel's error, my brethren dismiss the admission. They then conclude that, in any event, the employer rebutted that showing and "proved that its employment practices were rooted in 'legitimate business reasons.' " Id. at 102 (quoting Johnson v. Uncle Ben's, Inc., 657 F.2d 750, 753 (5th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982)). With all deference, I suggest that, even were there a "legitimate business reason," it would not be sufficient to excuse discriminatory practices. The test is simply incorrect. In addition, even were business reason enough, there is no evidence in the record to support the existence of any business reason for this separation of departments by race save the fact that "it had always been done this way." That traditional consideration is not a legitimate business reason.
 
 II.
 
 32
 In Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1970), the Supreme Court set forth the elements of proof in a disparate impact case. To make out a prima facie case, the plaintiff must prove that "practices, procedures, or tests neutral on their face, and even neutral in terms of intent ... operate to 'freeze' the status quo of prior discriminatory employment practices." Id. at 430, 91 S.Ct. at 853, 28 L.Ed.2d at 163. The employer must then rebut this showing by demonstrating "business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." Id. (emphasis added).
 
 
 33
 The Griggs Court left no doubt that: "Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question." Id. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 165 (emphasis added). In Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786, 797 (1977), the Court reiterated, "Once it is thus shown that the employment standards are discriminatory in effect, the employer must meet 'the burden of showing that any given requirement [has] a manifest relationship to the employment in question.' " (emphasis added) (quoting Griggs, 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 164).
 
 
 34
 In New York City Transit Authority v. Beazer, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), the Court stated that the plaintiff's statistical showing of disparate impact was "assuredly rebutted by the [defendant's] demonstration THAT ITS ... RULE (AND THE RULE'S APPLICATION ...) IS 'JOB RELATED.' " id. at 587, 99 S.Ct. at 1366, 59 L.Ed.2d at 603 (footnote omitted; emphasis added). The Court added in the footnote: "The record thus demonstrates that the [defendant's] rule bears a 'manifest relationship to the employment in question.' " Id. at 587 n. 31, 99 S.Ct. at 1366 n. 31, 59 L.Ed.2d at 603 n. 31 (emphasis in original) (quoting Griggs, 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 164); see also Beazer, 440 U.S. at 602, 99 S.Ct. at 1374, 59 L.Ed.2d at 612 (the employer "had the burden of showing job relatedness") (dissenting opinion).
 
 
 35
 We have used the words "business reason" but not in a way intended to water down the standard exacted by the Supreme Court. In Johnson v. Uncle Ben's, Inc., 657 F.2d 750 (5th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982), we held:
 
 
 36
 It is not part of the plaintiff's burden [in disparate impact cases] to prove absence of a legitimate business reason for the challenged practice. Knowledge of a legitimate business reason is uniquely available to the employer who is accordingly required to persuade the court of its existence by a preponderance of the evidence.
 
 
 37
 657 F.2d at 753. The Uncle Ben's court's use of the words "legitimate business reasons" does not, in my view, change the long-standing requirement that the employer prove "business necessity" or "job-relatedness." That is the standard which the Supreme Court has repeatedly employed in disparate impact cases, e.g., Beazer, 440 U.S. at 587 & n. 31, 99 S.Ct. at 1366 & n. 31, 59 L.Ed.2d at 603 & n. 31, and it has also been ours. See Johnson v. Uncle Ben's, Inc., 628 F.2d 419, 427 (5th Cir.1980), vacated, 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981). Therefore, it was the employer's burden in this case to demonstrate a manifest relationship between job requirements and the folder system. The record contains no evidence of this whatever. Even construed most favorably to the employer (as it should not be, because the employer bore the burden of proof), the evidence shows at best only that the folder system was convenient and was not adopted with discriminatory intent.
 
 III.
 
 38
 The magistrate found neither that the folder system and the resultant job stratification were exacted by job requirements nor even that they were based on "business reasons." He concluded instead that, even if the EEOC had made out a prima facie case, the defendant "articulated nondiscriminatory reasons for its employment policies." (emphasis added). Without finding the conclusion to be clearly erroneous or legally in error and without referring to the evidence, the majority amends this finding and concludes that "the employer proved that its employment practices were rooted in 'legitimate business reasons.' " Majority op. at 102 (emphasis added).
 
 
 39
 In the margin, I have set forth every word of testimony that I have found in the record by which the employer attempted to show the "business necessity" of the folder system.[12] There is simply no evidence of job-relatedness. Indeed the magistrate stated that the folder system is "not the best system which Defendant could have utilized."[13] Given this explicit finding, I see no demonstration of any relationship between the folder system and job requirements, let alone proof of it by a preponderance of the evidence.
 
 
 40
 The employer conceded the existence of a prima facie case of disparate impact. The employer failed to meet the burden of rebutting that case. The court's approval of the Sheraton's system denies implementation of the Supreme Court's majestic statement in Griggs: "What is required ... is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible qualities." 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 797. We must require the removal of even those walls created by the paper-thin layers of a file folder that become impenetrable racial barriers. With all due respect, I dissent.
 
 
 
 [1]
 The hotel has since been sold, and the EEOC has reserved the right to include the new owner in this action. However, our decision today obviates the need for any substitution of parties
 
 
 [2]
 The class did not include unsuccessful job applicants of the Biloxi Sheraton. However, the district court did not exclude unsuccessful applicants from being included in any prospective, corrective relief. Nor did the court below preclude a showing at trial of how the selection process at the Sheraton affected black applicants
 
 
 [3]
 Since unsuccessful job applicants are not included in this class action, claims of discrimination in the hiring process per se are not before us. We are concerned only with the effect this hiring system might have had on the initial placement and subsequent promotion opportunities of the hotel's employees
 
 
 [4]
 Although the certified class included only employees from October, 1972, to the present, the court examined employment practices from the hotel's opening in 1971, because discrimination in the earliest days could result in remnants of discrimination in later years. See Teamsters, 431 U.S. at 386-88, 97 S.Ct. at 1881 (separate opinion of Marshall, J.)
 
 
 [1]
 These claims, of course, are disparate treatment rather than disparate impact charges. The EEOC did not press the disparate treatment claims on appeal and I mention them only to give the complete background
 
 
 [2]
 Jacqueline Taylor, a black, testified that she applied for a job as a cocktail waitress, a "white" position. She was told that there were no openings and filled out an application for "busgirl or openings." Two white cocktail waitresses were hired within two weeks of Taylor's application. Larry McGill, a black who sought to apply for a job as a waiter, was directed to the bellman department because there were allegedly no openings for waiters
 
 
 [3]
 Ronnie Lewis, a black, applied for work as a busboy, waiter, and security guard, with busboy listed first. The EEOC contended that the waiter and security positions were "white"; Mr. Lewis, despite military training as a guard, was never considered for security guard vacancies
 The magistrate concluded, however, "although there is no evidence ... that the Defendant always informed applicants of this procedure [filing the application under the first job listed], there is no suggestion that the Defendant attempted to deceive either white or black applicants in that regard."
 
 
 [4]
 Clarence Hawthorne, a black, indicated "open" on his application. He had worked eight years as a machine operator and testified that he was interested in a maintenance, office, bartending, or waiter position. He was not considered for any of thirty vacancies in maintenance during the six months after his application
 
 
 [5]
 The magistrate also found:
 In attacking the folder system ... the Plaintiff has alleged that the system has a disparate effect towards blacks in general. This Court is of the opinion, however, the [sic] plaintiff has failed to make a showing by a preponderance of the evidence that the folder system does in fact discriminate against blacks because of race. The folder system was set up with the intention of placing the hundreds of applicants into positions requested as a preference. To be sure, there were instances evidenced where qualified black individuals were placed into lower level positions when they had experience in upper level positions. However, the Plaintiff has failed to demonstrate that white applicants were treated any differently under this system. (emphasis added).
 
 
 [6]
 The majority attempts to demonstrate that the magistrate understood the issue in the disparate impact portion of this case by quoting his finding of fact that the EEOC failed to prove "that the folder system has a disparate impact on black applicants or black employees moving from one position to another." Such summary treatment of the disparate impact question is not adequate given the contradictory language in both the above-quoted finding of fact and conclusion of law. See supra note 5 & accompanying text
 
 
 [7]
 See also Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1970) (employment standard not significantly related to job performance, disqualified blacks at substantially higher rates than whites, and applied to jobs formerly filled only by whites)
 
 
 [8]
 Griggs, 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 163 (high school completion requirement not shown to have demonstrable relationship to successful job performance); Johnson v. Uncle Ben's, Inc., 628 F.2d at 427; Payne v. Travenol Laboratories, 565 F.2d 895, 899-900 (5th Cir.), cert. denied, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978)
 
 
 [9]
 Dothard v. Rawlinson, 433 U.S. 321, 329-32, 97 S.Ct. 2720, 2726-28, 53 L.Ed.2d 786, 796-797 (1977)
 
 
 [10]
 Griggs, 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 163 (test not shown to have demonstrable relationship to successful job performance); Ensley Branch, NAACP v. Seibels, 616 F.2d 812, 816-18 (5th Cir.), cert. denied, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980)
 
 
 [11]
 The magistrate refused to credit the EEOC's statistical proof of segregated departments because the paralegal who prepared the exhibits admitted that she had classified all persons whose race was unknown as white. Yet there was ample and uncontradicted testimony from a number of witnesses, including defendant's witnesses Longnecker and Kimbrough, that until 1977 there were no blacks in security, maintenance, office, sales, accounting, bartender, front desk, and cocktail waitress positions. The bell stand was an all black department and the kitchen was predominantly black. As Richard Kimbrough stated referring to the Sheraton's workforce at the time of trial: "[Blacks] have been hired basically in the areas that they have applied for, and most of them applied for the kitchen. And they have applied for housekeeping and they have applied for bellman, that's where they have been mostly working."
 The magistrate concluded that the undisputed testimony about the existence of segregated departments was insufficient to make out a prima facie case of discrimination. Yet he found: "The accounting and general, front desk, sales department, beverage and the maintenance have been predominantly white, whereas the bells and kitchen departments have remained predominantly black." He concluded that this fact was insignificant because blacks applied in disproportionately high numbers to the "black departments" and in disproportionately low numbers to the "white departments"; thus, the Sheraton's hiring reflected the applicant flow. He also added that the EEOC "failed to present any evidence of the desirability of the predominantly white departments as opposed to the predominantly black departments.... very few blacks were even interested in applying for jobs in these predominantly white departments.... there was no proof whatsoever that any black was deterred from applying for jobs in these departments.... no evidence was presented concerning any pay disparity between the ... departments...."
 In effect, the magistrate chose to ignore the existence of segregated departments and of the folder system's perpetuation of that segregation. The testimony is sufficient to establish a prima facie case of racial discrimination. Although counsel for Kimbrough conceded this point at oral argument, my brethren consider this an inadvertent and incorrect admission.
 
 
 [12]
 Martin Longnecker, Sr., the hotel's former accountant, gave the only direct testimony about the "necessity" for the folder system
 Q. Mr. Longnecker, are you familiar with the folder procedure for classifying applications at the Sheraton?
 A. Yes, I am.
 Q. Are you aware of how those folders are kept?
 A. Yes, I am aware.
 Q. And do you know how long the folder system has been in existence?
 A. I would say since the motel was started back in '71 or '72.
 Q. When do you have personal knowledge of it being in existence?
 A. My own personal knowledge is when I took over the job.
 BY THE COURT:
 February of 1977?
 A. February of 1977.
 ....
 Q. Mr. Longnecker, with respect to the folder procedure that you testified you were familiar with a moment or two ago, is there some business reason why all applications are not lumped in a single folder?
 A. Well, if they were all lumped in one folder, it would require a great deal of research to get a particular applicant, so therefore, it is departmentalized for easy referral in chronological order. The folder is taken that way, or filed that way.
 John Hahn, Chief of Security, testified that people applying for more than one job were, after 1978, required to fill out multiple applications. He stated: "That was the reason it was done that way and it was a lot easier to file."
 
 
 [13]
 In Dothard, the Court held that if the employer proves that the challenged requirement is job-related, the plaintiff may then show that "other selection devices without a similar discriminatory impact" would also serve the employer's legitimate interest. 433 U.S. at 329, 97 S.Ct. at 2727, 53 L.Ed.2d at 797. Therefore, even if the Sheraton had proved that the folder system is job-related, the district court's finding that other selection systems would have been better and would not have had discriminatory impact means that the plaintiff should have prevailed. See Zuniga v. Kleberg County Hosp., 692 F.2d 986, 992-93 (5th Cir.1982) (less discriminatory alternative)