Lynn T. LEVIN, et al., and Equal Employment Opportunity Commission, et al., Plaintiffs-Appellants,

v.

DELTA AIR LINES, INC., Defendant-Appellee.

No. 82–2533.

United States Court of Appeals, Fifth Circuit.

April 30, 1984.

Rehearing Denied June 14, 1984.

---

Richard T. Seymour, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for Levin and Mann.

Colleen M. O'Connor, Karen MacRae Smith, E.E.O.C., Appellate Services Div., Washington, D.C., for E.E.O.C.

Baker & Botts, Richard R. Brann, Houston, Tex., William H. Boice, Susan Q. Downer, Atlanta, Ga., for defendant-appellee.

Before CLARK, Chief Judge, BROWN and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The Equal Employment Opportunity Commission and a class of Delta Air Lines flight attendants urge the illegality of Delta's policy of removing pregnant flight attendants from flight duty as soon as their pregnancy is discovered. Before 1974, pregnant flight attendants were evidently placed on unpaid maternity leave, but since 1974, Delta has permitted them to transfer to available ground positions. Plaintiffs charge that the Delta pregnancy policy violates the sex discrimination prohibition of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,*[1] and particularly

---

**1.** 42 U.S.C. § 2000e–2(a) provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to-hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an

the 1978 Pregnancy Amendments to Title VII, 92 Stat. 2076, 42 U.S.C. § 2000e(k),[2] and regulations promulgated thereunder, 29 C.F.R. § 1604.10.[3] Delta defended on the ground that the presence of pregnant flight attendants would pose a threat to the safe operation of its flights, particularly in an emergency situation. After a bench trial in which extensive medical evidence was advanced by both sides, the district court held that the plaintiffs had shown disparate impact and disparate treatment based on sex, but that Delta had successfully established that its policy was justified by business necessity and that pregnancy was a bona fide occupational qualification. Further, the plaintiffs had failed to show that these legitimate concerns were used by Delta as a pretext for invidious sex-based discrimination or that there existed a less discriminatory alternative to Delta's pregnancy policy. Because the district judge correctly applied the law and made no material factual findings that we deem clearly erroneous, we affirm this judgment.

## I

Through Delta's early years of operation, flight attendants were obliged to be unmarried, and pregnancy—in or out of wedlock—was grounds for firing. After March 1967, Delta permitted its flight attendants to marry, but continued firing all pregnant flight attendants until November 9, 1970, whereafter such attendants were placed on unpaid maternity leave, accumulating seniority only for the first ninety days of leave. A modification in November 1972 enabled attendants on maternity leave to accumulate seniority throughout the leave period. Finally, on July 22, 1974, Delta adopted a policy of permitting pregnant flight attendants to transfer to available ground positions. Delta has never permitted pregnant flight attendants to continue on flight duty once their pregnancy was made known to the company.

## II

As a policy concerning pregnancy is facially neutral with respect to sex, it must be examined for disparate impact on women—and, of course, disparate impact is easily perceived. The addition of the Pregnancy Amendments in 1978 explicitly defined sex discrimination to comprehend discrimination by reason of pregnancy, so that any pregnancy-regarding policy would thereafter be held to effect disparate treatment of women.

We agree with the district court that Delta's pregnancy policy has been *prima facie* discriminatory under Title VII throughout the relevant period. Before 1978 the policy had a disparate impact on women, *see Harriss v. Pan American World Airways, Inc.,* 649 F.2d 670, 674 (9th Cir.1980); *Burwell v. Eastern Air Lines, Inc.,* 633 F.2d 361, 364 (4th Cir.1980) (en banc) (opinion of Sprouse, J.), *cert. de-*

---

employee, because of such individual's race, color, religion, sex, or national origin.

**2.** 42 U.S.C. § 2000e(k) provides:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work
. . . .

**3.** 29 C.F.R. § 1604.10 provides:

(a) A written or unwritten employment policy or practice which excludes from employment applicants or employees because of pregnancy, childbirth or related medical conditions is a prima facie violation of Title VII.

(b) Disabilities caused or contributed to by pregnancy, childbirth, or related medical conditions, for all job-related purposes, shall be treated the same as disabilities caused or contributed to by other medical conditions, under any health or disability insurance or sick leave plan available in connection with employment. Written or unwritten employment policies and practices involving matters such as the commencement and duration of leave, the availability of extensions, the accrual of seniority and other benefits and privileges, reinstatement, and payment under any health or disability insurance or sick leave plan, formal or informal, shall be applied to disability due to pregnancy, childbirth or related medical conditions on the same terms and conditions as they are applied to other disabilities.

*nied,* 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981), and after 1978 it constituted disparate treatment, *see Harriss,* 649 F.2d at 676. Of course, as the district court noted, the policy continued to have a disparate impact on women in the post-1978 period.

The distinction between impact and treatment includes a difference in the showing that must be made by the employer to overcome the charge of discrimination. Once a *prima facie* violation has been established, the burden shifts to the employer to justify the particular employment practice. *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The practice may be justified by showing that a policy with a disparate impact is justified by business necessity, and that disparate treatment is based on a bona fide occupational qualification. These two concepts are related in that each is grounded in the functional necessities of business operation.

To pass muster under Title VII, a discriminatory policy must be addressed to the "essence" of the business operation. *Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385, 388 (5th Cir.1971). Safety is of the essence of an airline's function; satisfying patrons' presumed penchant for physically attractive flight attendants is not. *Id.* Thus, Delta attempts to justify its policy on grounds of safety, while the plaintiffs charge that it is motivated principally by a concern for customer preferences. For present purposes, the distinction between a business necessity defense and a BFOQ defense is largely irrelevant. If Delta's pregnancy policy can be shown to reduce substantially the risks attending air travel, its policy should be upheld against Title VII challenge.

## III

Delta presented evidence at trial establishing that pregnant women are subject to certain pregnancy-related ailments—primarily spontaneous abortion, morning sickness, and fatigue—which could disable a flight attendant with little warning, leaving her incapable of performing routine safety functions and depriving the passengers of her vital assistance in the event of an emergency.

Plaintiffs countered with medical evidence discounting the suddenness or severity with which pregnancy-related ailments strike, and mathematical reasoning designed to show that the likelihood of a pregnant flight attendant being incapacitated at the same time that an emergency evacuation is required is infinitesimally small. Plaintiffs did not dispute that these ailments could impair a flight attendant's performance of routine safety functions such as monitoring of seatbelt use, fire prevention, and care for passengers who become ill.

In this circuit, a discriminatory standard can be upheld only if its contribution to safety is more than minimal. *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224, 234–35 (5th Cir.1976). At the same time, safety is of sufficient importance that "the employer must be afforded substantial discretion in selecting specific standards which, if they err at all, should err on the side of preservation of life and limb." *Id.* at 238. Although the employer must establish "a reasonable basis for its assessment of risk of injury/death," there is no requirement of "certainty." *Id.* Finally, "[t]he greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications . . . ." *Id.* at 236.

In the face of conflicting medical evidence, the district court concluded a legitimate concern for safety justifies Delta's pregnancy policy. The court found that "because of Delta's maternity leave policy the risk of severe injury to passengers who survive an accident is greatly reduced . . . ." Regardless of whether the record supports a conclusion that risks are "greatly" reduced, we affirm the finding that the contribution to safety is sufficiently significant to be legally cognizable under *Tamiami.* Delta's policy of grounding pregnant

flight attendants is neither unrelated to its safety concerns nor a manifestly unreasonable response to those concerns.

The next inquiry mandated by *Tamiami* is whether the airline "had reasonable cause, that is, a factual basis, for believing that all or substantially all [pregnant flight attendants] would be unable to perform safely and efficiently the duties of the job involved, *or* whether it is impossible or impractical to deal with [pregnant flight attendants] on an individualized basis." *Tamiami*, 531 F.2d at 236 (emphasis in original). The district court held that Delta's policy passed muster under either prong of this test. The record will not support a finding that all or substantially all pregnant flight attendants are unable to perform their duties safely. Indeed, the record evidence is overwhelming that most pregnant flight attendants would never be severely impaired in performance of their duties. But we understand the district court to say only—as it did in another finding—that all pregnant women overcome by fatigue, nausea, or spontaneous abortion would be unable to perform their duties. It is the inability to predict in advance which pregnant flight attendants will suffer these ailments that makes it so difficult for Delta to deal with pregnant flight attendants on an individualized basis and thus justifies its blanket exclusion of pregnant attendants from flight duty under the second prong of this *Tamiami* test.

## IV

Plaintiffs assert that even if pregnancy is a BFOQ for flight attendants on the basis of safety, that holding may be overcome by evidence that the employer does not adhere to a single standard for safety across the board, but imposes different safety standards in different facets of its operations, with the more stringent safety standard being employed with respect to a policy having a detrimental effect on a class of employees specifically protected by Title VII. Thus, plaintiffs sought to prove at trial that, although Delta cites safety concerns as the justification for its pregnancy policy, the airline does not make comparable efforts to remove from flight duty those attendants suffering from other medical conditions that might be similarly incapacitating, such as epilepsy and insulin-controlled diabetes. Their argument is that if Delta does not apply the same safety standard to all comparable medical conditions, that will establish that the safety considerations urged in support of the pregnancy policy are a "pretext," and Delta may then be presumed to have acted out of some animus toward the protected group. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973).

We note, first, that this argument is not properly one of "pretext." Pretext, *per se*, may not be used to overcome a finding of BFOQ, as we shall explain below. Rather, any inconsistency in an employer's safety standards is relevant in the determination of whether a particular attribute is a BFOQ at all. If it is established that an employer takes a lax approach to safety in comparable matters, the employer may be hard-pressed to convince the court that it deems the contribution to safety effected by the challenged policy to be necessary to the essence of its business operations.[1] Thus,

---

**4.** The precise scope of the inquiry must be determined in light of the particular facts of each case. Plaintiffs could not here contend that, because Delta has reduced the risks posed by pregnant flight attendants to zero, the airline must strive to operate at zero risk in every aspect of its operations or surrender any claim that pregnancy is a BFOQ. Thus, plaintiffs could not have carried their burden by showing that the airline failed to take some step in the field of, e.g., aircraft maintenance which would

contribute as much to safety as the pregnancy policy. The plaintiffs and the district court were correct to limit their inquiry almost entirely to Delta's treatment of flight attendants suffering medical conditions with a danger of impairment roughly comparable to that experienced with pregnancy. The observation by the plaintiffs that Delta does not require that its flight attendants be able to swim stands at the margin of relevance; though inability to swim is not a medical condition, it is a trait that might

in *Tamiami*, we reviewed the employer's practices respecting health and safety at length, 531 F.2d at 232–33, and satisfied ourselves that the employer was unswerving in its commitment to maximize the safety of its operations, before turning to the question of whether the district court had correctly found that the contribution to safety made by the age-related standard there in dispute was necessary to the essence of the employer's business as defined by the employer's own actions.

Here, too, it is Delta's commitment to safety in comparable matters that enables the airline to justify this particular practice under the BFOQ doctrine. Thus, pregnancy is not a BFOQ with respect to all airlines as a transcendant matter of law. Rather, the determination is fact-specific, and it will be open to plaintiffs suing any particular carrier to demonstrate that the employer's purported fidelity to safety concerns as being at the essence of its operations is belied by inconsistent practices. The district court here held that Delta's commitment to safety was sufficient to sustain its BFOQ defense of the pregnancy policy, and that Delta does not permit persons with medical conditions comparable to pregnancy in their effect on safety to serve as flight attendants. Though the record evidence on this question is spotty, it is adequate to support the district court's finding, which is not clearly erroneous.

The flight attendant plaintiffs [5] seek next to raise an alternative pretext theory. They claim that, even if the pregnancy policy is objectively sustainable under the business necessity and BFOQ doctrines, the policy should be held invalid if the airline's actual motivation in adopting it was not a concern for safety but some animus toward the protected class. To this end, these plaintiffs note that Delta adopted its pregnancy policy without seeking prior medical comment as to the risks posed by employing pregnant flight attendants, and they complain of the district court's refusal to permit them more extensive discovery into Delta's original motivation for adopting the policy.

We find no basis in Title VII for plaintiffs' alternative theory. If this theory were accepted, a court might find itself obliged to order an airline to employ pregnant flight attendants despite the fact that the court had already determined both that the presence of pregnant flight attendants posed a significant safety risk and that attendants with comparable medical conditions were uniformly removed from flight duty. By contrast, if the airline permits flight attendants with comparable medical conditions to fly, a BFOQ or business necessity defense may be rejected because we are not then interfering with the level of passenger safety chosen by the airline.[6]

For this reason, we deem erroneous the district court's statement that "a finding that the maternity leave policy was a pretext for discrimination against pregnant women must be based on Delta's motives in adopting this policy," and we need not review that court's finding that Delta was not improperly motivated when it adopted the policy. The flight attendants' contention that they should have been afforded more extensive discovery into Delta's motivation is likewise laid to rest.

The third pretext argument raised by the plaintiffs is that there existed a less discriminatory alternative to Delta's evident policy before July 22, 1974 of placing all pregnant flight attendants on unpaid maternity leave. Specifically, plaintiffs urge that Delta could have shifted pregnant

---

render a flight attendant physically incapable of assisting passengers under certain circumstances. However, our review of the record convinces us that Delta's failure to require swimming ability poses no legally significant threat to the safety of Delta's passengers.

**5.** The EEOC does not join this argument, and would concede that an improper motive does not invalidate an objectively sustainable policy.

**6.** Thus, motive is relevant to the pretext inquiry in a McDonnell Douglas-type situation where there is disparate treatment of individuals or groups as to whom there exist equally legitimate grounds for adverse employment action. *See Chalk v. Secy. of Labor*, 565 F.2d 764, 766–67 (D.C.Cir.1977), *cert. denied*, 435 U.S. 945, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978).

flight attendants to available ground positions, as it has been doing since July 22, 1974 under a policy adopted that date.

At the threshold, Delta does not concede that it refused to permit such transfers before July 1974. It acknowledges that a written policy guaranteeing a right to transfer to available ground positions was adopted only in July 1974, but maintains that plaintiffs have failed to establish that any pregnant flight attendant before that date sought and was denied such a transfer. On the other hand, Delta did not affirmatively claim below or here that it permitted such transfers prior to July 1974, and the district court made no explicit findings on this question.

The basis for the "less discriminatory alternative" doctrine is the Supreme Court's observation in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), that a standard which has no discriminatory effect and serves the employer's legitimate purposes must be used in preference to a standard with a more discriminatory effect. *See also Head v. Timken Roller Bearing Co.,* 486 F.2d 870, 879 (6th Cir.1973); *Robinson v. Lorillard Corp.,* 444 F.2d 791, 798 (4th Cir.), *cert. denied,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). The employer in *Albemarle* used standardized tests which excluded a disproportionate number of black workers from access to skilled job positions. In striking down the tests as not job-related, the Court noted that even a job-related test could be challenged if an equally valid predictor of job qualification would exclude fewer black workers; the employer's argument of job-relatedness would stand revealed as a pretext for discrimination if the more restrictive test continued to be utilized.

In *Albemarle,* only the number of minority workers excluded by a standard was at issue. Later cases, however, have expanded upon the *Albemarle* rule to address the depth of the discriminatory impact as well as the breadth. *See, e.g., Wright v. Olin*

*Corp.,* 697 F.2d 1172, 1191 (4th Cir.1982). Thus, if no alternative policy exists which will achieve the employer's legitimate business purposes while having a discriminatory effect on fewer members of the protected class, but an alternative does exist which will have a less detrimental impact on the affected class members, that alternative may have to be employed.

In *Zuniga v. Kleberg County Hospital,* 692 F.2d 986 (5th Cir.1982), we held that the hospital had violated Title VII when it fired a pregnant x-ray technician. Though we assumed there that the hospital might be able to justify its removal of pregnant workers from constant exposure to x-rays under the business necessity doctrine, we held that placing these employees on leave was a less discriminatory alternative to firing them. Though there was evidence in *Zuniga* that employees incapacitated by medical conditions other than pregnancy were placed on leave rather than fired, and that the pregnancy policy could therefore have been voided under the more standard pretext analysis, our use of the "less discriminatory alternative" analysis is telling. Placing pregnant x-ray technicians on leave rather than firing them would not have reduced the *number* of employees affected by the policy, but would have reduced the adverse *impact* of the policy upon those employees affected. We rejected the hospital's contention that this policy change would threaten the continuity of its operations.

In *Hayes v. Shelby Memorial Hospital,* 546 F.Supp. 259 (N.D.Ala.1982), *aff'd,* 726 F.2d 1543 (11th Cir.1983), a case factually similar to *Zuniga,* the district court held that the hospital's firing of a pregnant x-ray technician was unjustifiable because she could have been assigned to other duties not involving constant exposure to x-rays.[7] Central to the court's holding was its finding that making some adjustments to the duties of the pregnant x-ray technician would not significantly disrupt the hospital's functioning. Thus, where a less

---

7. The court expressed its holding two ways: Either the hospital's policy was viewed as one of *firing* pregnant x-ray technicians, in which case

the policy was not justifiable as a business necessity because there was no need to fire (rather than transfer) the employee, or the policy was

discriminatory alternative employment scheme is readily perceivable and places no burden on the employer, Title VII is sufficiently flexible to permit the courts to preempt the discretion ordinarily afforded the employer in setting his employment practices. *Wright v. Olin Corp.*, 697 F.2d at 1191–92 n. 30.[8]

On the other hand, Title VII does not purport to shield protected workers from all adverse consequences of non-invidious employment decisions. When an employer has established that a standard is justified as a BFOQ or by business necessity, it would be unreasonable to place on it the burden of taking extraordinary measures to cushion the blow for affected employees. A "less discriminatory alternative," therefore, is only that which accords with the employer's customary practices so amenably that the failure to use the alternative indicates that the legitimate concerns supporting the challenged standard are pretextual.

Our holding in *Zuniga* is grounded in a finding that placing the pregnant technician on leave would not have burdened the hospital's operations and was administratively a natural alternative to firing the employee. Similarly, though we do not here review the holding of the *Hayes* case, that holding may be supported on the grounds that the technician's training and duties could be directly utilized in areas of the hospital where she would not be exposed to x-rays; there was even evidence that Mrs. Hayes could have remained in the same work area if she had been permitted to change shifts. Thus, *Hayes* apparently does not—and *Zuniga* certainly does not—require an employer to move a pregnant employee into a new job calling for skills and training not associated with the original employment position. A contrary resolution would intrude the courts directly into complex assessments of employment qualifications, transferability of skills, staffing requirements, and the relationship of learning curves to productivity that are best left to the employer. As the Supreme Court cautioned in *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978), courts are "generally less competent than employers to restructure business practices."

Here there is no suggestion that transferring pregnant flight attendants to available ground positions would have effected a significant disruption of Delta's operations. Indeed, Delta voluntarily adopted that policy in July 1974. Nevertheless, the job of flight attendant is manifestly distinct from any ground position; the training and skills required are general-

---

simply one of *removing* pregnant technicians from exposure to x-rays, in which case the basic policy was assumed to be justified by business necessity but the practice of firing these technicians rather than transferring them established pretext and thus overcame the business necessity defense. This dual analysis reflects the Supreme Court's observation in *Burdine* that the plaintiff's burden in proving pretext eventually "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." 450 U.S. at 256, 101 S.Ct. at 1095.

**8.** If the employer can easily accommodate the special concerns of the protected class, a more extreme adjustment of his employment practices may be ordered, though such cases are usually addressed in terms of the employer's failure initially to prove business necessity or BFOQ, rather than the plaintiff's success in overcoming the employer's defense with a showing of pretext. *Cf.* note 7, *supra*. A good example is *Hardin v. Stynchcomb*, 691 F.2d 1364

(11th Cir.1982), in which a sheriff tried to justify his policy of not hiring female deputies on the ground that all deputies had to do guard duty in the jail, where the great majority of prisoners were male and the prisoners' shower and toilet facilities were exposed to the guards' view. The court held that sex was not a BFOQ because the duties of female deputies could have been modified slightly to avoid objectionable contact with the prisoners; there was no justification for a refusal to hire women at all. Note, however, that some disparate treatment of women was justifiable in the court's view. In determining which guards should oversee shower and toilet facilities and conduct strip searches, sex would be a BFOQ. However, this fact cannot justify a policy of not hiring any women to serve as deputies and jail guards, because modifying the duties of female guards is a less discriminatory alternative to excluding them from employment altogether. *Accord, Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079, 1097 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980).

ly unrelated. Consequently it cannot be said that permitting such transfers entailed no burden for the employer and was administratively a natural alternative to placing pregnant flight attendants on maternity leave. Delta's decision to permit transfers to ground positions doubtless came only after the airline had made the sorts of assessments listed above—assessments that neither the statute nor the case law authorize us to make for the employer in these circumstances. It follows that any failure by Delta to permit such transfers before July 1974 cannot constitute a violation of Title VII.

V

In sum, we affirm the district court's findings that the plaintiffs established a prima facie violation of Title VII based on disparate impact and disparate treatment. The findings that Delta's policy of removing pregnant flight attendants from flight duty is justified as a business necessity and that pregnancy is a BFOQ are also affirmed. Additionally, we have rejected the argument that Title VII here imposed a duty to transfer pregnant flight attendants to available ground positions. Judgment was properly rendered for the defendant.

AFFIRMED.