**In re PAN AMERICAN WORLD AIRWAYS, INC., MATERNITY LEAVE PRACTICES & FLIGHT ATTENDANT WEIGHT PROGRAM LITIGATION.**

**Susan Gail LEONARD, on behalf of herself as an individual and on behalf of all others similarly situated, Plaintiffs–Appellees,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., Defendant–Appellant,**

**Air Line Pilots Association, et al., Defendants.**

**Barbara Ann GARDNER, Sherry Knipple and Marilyn White, Plaintiffs–Appellees,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., Defendant–Appellant,**

**Transport Workers Union, Defendant.**

No. 88–5509.

United States Court of Appeals, Eleventh Circuit.

July 13, 1990.

Joseph P. Klock, Jr., Carlos A. Batlle, Miami, Fla., for Pan American World Airways, Inc.

Donald B. Myers, Seattle, Wash., for plaintiffs-appellees.

Before CLARK and EDMONDSON, Circuit Judges, and RUBIN *, Senior Circuit Judge.

* Honorable Alvin B. Rubin, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

ALVIN B. RUBIN, Senior Circuit Judge:

A female flight attendant, discharged from her position for failing to comply with her company's maternity-leave policy, filed a class action against the company, challenging the policy on the ground that it was discriminatory on the basis of sex. The district court found that the policy was discriminatory and awarded relief to the complaining flight attendant, despite the company's objection that the policy as applied to her was not discriminatory and, therefore, that she was not a "proper" member of the plaintiff class. Reurging this objection with various modifications and, further, arguing that the district court lacked subject matter jurisdiction over the flight attendant's claim, the company asks us to overturn the award. For the reasons stated below, we affirm.

## I

In 1967 National Airlines, an air carrier that has since been acquired by Pan American World Airways, entered into a collective bargaining agreement with the Airline Pilots Association (ALPA), the labor organization then representing its flight attendants. That agreement included a "maternity clause," which required a flight attendant, on learning that she was pregnant, to "resign or be discharged without recourse."

National and the ALPA modified this maternity clause in 1971. The new agreement eliminated pregnancy as a cause for discharge, but it required a flight attendant who became pregnant to notify National of her condition immediately on learning of it herself. She was then to be placed on leave without pay for the duration of her pregnancy. Finally, she was required to return to work within sixty days after delivering her child unless National's medical examiner concluded that she should be afforded additional time. The agreement provided that violation of any of these requirements constituted cause for discharge.

In March 1973, Marilyn White, who had been employed as a flight attendant by National since 1963, informed her superiors that she was pregnant. By that time she had been pregnant at least twenty-one and a half and perhaps as many as twenty-four weeks. Concluding that White had failed to give notice as soon as she discovered she was pregnant, National promptly discharged her.

White and several other former National employees later filed a class action against National, on behalf of themselves and other similarly-situated National employees, alleging that National's maternity-leave policies and practices were discriminatory on the basis of sex and therefore violated Title VII of the Civil Rights Act of 1964 (Title VII).[1] In its answer to the petition, National denied the charge of discrimination. In the alternative, National maintained that even if the contested policy was discriminatory, it did not violate Title VII because it was reasonably necessary to the successful operation of National's business and reflected a *"bona fide* occupational qualification" (BFOQ). The substance of this defense was that grounding pregnant flight attendants was essential to assure passenger safety. According to National, because of the loss of stamina and agility that they experience as a result of their condition, pregnant flight attendants are unable to render necessary assistance to passengers during flight emergencies.

The district court certified the class action,[2] defining the class as "[f]emale personnel who have been employed by National Airlines, Inc. on or after January 29, 1972, or who may become so employed in the future," and designated White as the co-representative for the "subclass of female flight cabin attendants."[3] Shortly

---

**1.** 42 U.S.C. §§ 2000e through 2000e–17 (1982 & Supp.V 1987).

**2.** *See* Fed.R.Civ.P. 23(b)(2).

**3.** *See In re National Airlines, Inc.,* 434 F.Supp. 249, 253 (S.D.Fla.1977). In a subsequent order, the district court modified the certification by fixing the temporal starting point for the subclass of flight cabin attendants at April 6, 1973.

thereafter, the court ordered separate trials of the liability and remedy issues.[4]

In an opinion written after the liability-phase hearing, the court concluded that the plaintiffs had carried their burden of establishing that the maternity-leave policy embodied in the 1971 agreement was *prima facie* discriminatory. The court then proceeded to consider what it termed National's "BFOQ" defense. The court began its analysis by dividing the policy into two separate subpolicies, each one corresponding to a distinct sentence in the agreement—the "stop" policy (the requirement that the attendant take a leave of absence immediately on giving the company notice of her pregnancy) and the "start" policy (the requirement that the attendant return to work within sixty days of the birth of her child). The court did not, at this point in its opinion, mention the sentence in the agreement that required a flight attendant to give notice of her pregnancy.

The court rejected National's defense of the stop provision. Purporting to balance the attendants' Title VII interest against National's interest in passenger safety, the court laid down the following rules regarding the circumstances under which National could lawfully force pregnant attendants to take maternity leave: (i) first trimester: National could not require the attendant to take leave; (ii) second trimester: National could require the attendant to take leave, unless National's medical examiner certified that she was medically fit and capable of carrying out her assigned duties; and (iii) third trimester: National could require the attendant to take leave. Regarding the second provision, which set out the start policy, the court accepted the proffered defense.

Following the liability-phase hearing, the court considered White's demand for back pay, reinstatement, and attorney's fees. In its brief to the court, National contended

that White should not be regarded as a member of the subclass of flight attendants and, in any event, was not entitled to relief. As National pointed out, White had not "beg[u]n her maternity leave [until] the 23rd or 24th week of pregnancy."[5] According to National, she thereby waited "three to four weeks beyond the time that National could without question [have] require[d] her to stop flying."[6] Consequently, National argued, White was not discharged on the basis of a discriminatory policy; rather, she was discharged "at a time when the [maternity-leave] standard was ... clearly lawful."[7] The district court disagreed. According to the court, it was obligated to presume, in the absence of clear and convincing proof to the contrary, that White would have complied with National's maternity-leave policy if it had not been discriminatory. Finding no evidence tending to overcome this "presumption," the court awarded White the requested relief.

## II

In its answer to the complaint and in several documents subsequently submitted to the district court, National described its defense as a "business necessity or BFOQ defense." The district court, however, chose to use only the latter of these alternative denominations in addressing the defense.

In a Title VII sex-discrimination action, two different theories of liability are potentially available to the plaintiff: disparate treatment and disparate impact.[8] The disparate-treatment theory, this court has noted, can be further subdivided into two subtheories: facial discrimination and pretextual discrimination.[9] A different affirmative defense may be offered to each of these theories of liability. In a disparate-treatment case, the defendant's affirmative

---

4. *See* Fed.R.Civ.P. 42(b).

5. Defendant's Reply Memorandum on Issues Remaining Before the Court at 2, *reprinted in* Appendix to Brief for Appellant at 39.

6. *Id.*

7. *Id.*

8. *Hayes v. Shelby Memorial Hosp.,* 726 F.2d 1543, 1547 (11th Cir.1984); *Segar v. Smith,* 738 F.2d 1249, 1265 (D.C.Cir.1984).

9. *Hayes,* 726 F.2d at 1547.

defense is that the policy, practice, or action is based on a BFOQ. In a disparate-impact case, on the other hand, the appropriate defense is that of business necessity.[10]

Shortly before the liability-phase hearing, as the district court correctly noted, the Supreme Court had ruled that discrimination on the basis of pregnancy was not tantamount to sexual discrimination per se.[11] One effect of this ruling was to prevent a person aggrieved by a pregnancy-discriminatory policy from obtaining Title VII relief on the basis of the "facial discrimination" disparate-treatment subtheory.[12] Consequently, at the time of this litigation, White's counsel may have assumed that the only theories open to the plaintiffs were that the policy had a disparate impact and that the policy was pretextual.[13] The appropriate defense to the latter theory—the one on which the parties and the district court concentrated their attention—was business necessity rather than BFOQ.[14]

Relabelling the defense on which National relied in defending itself against White's disparate-impact claim does not affect the result of this appeal. We discuss this matter only to make it clear that "business necessity" is the correct legal description of that defense.

### III

In support of its claim that the district court's award to White must be set aside, PanAm advances three arguments. First, White was neither a suitable representative for the subclass of cabin flight attendants nor, indeed, even a member of that subclass. Second, she was not discharged on the basis of a discriminatory policy and, therefore, suffered no Title VII harm. Third, the district court lacked subject matter jurisdiction over White's claim for relief. We begin our discussion with the second argument, for it provides the foundation for the first and the third.

### A

In some instances, simply interpreting a party's argument points the way to a correct resolution of the issue. Beginning in the proceedings below and continuing in this appeal, PanAm has cast its absence-of-discrimination argument in ambiguous terms, terms that render the argument susceptible of multiple constructions. We therefore address each of the possible versions of the argument.

### 1

The first possible construction of PanAm's absence-of-discrimination argument is as follows. The "notice" provision in the 1971 agreement, which required a pregnant flight attendant to notify National of her condition immediately on learning of it herself, is severable from the "stop" provision in that agreement, which allowed National to place a flight attendant on leave immediately on receiving notice of the pregnancy. The district judge, by not making any express references to the notice provision in its liability-phase opinion, impliedly indicated that he considered that provision to be nondiscriminatory. National discharged White for failing to comply with that provision. Therefore, White's discharge cannot be attributed to her having been subjected to a discriminatory policy.

■ The argument fails for two reasons, one procedural, the other substantive. A federal appellate court will not, as a general rule, consider an issue that is raised for

---

**10.** Id.; E.E.O.C. v. Rath Packing Co., 787 F.2d 318, 327 n. 10 (8th Cir.1986); Segar, 738 F.2d at 1268; Levin v. Delta Air Lines, Inc., 730 F.2d 994, 997 (5th Cir.1984). But cf. Burwell v. Eastern Air Lines, Inc., 633 F.2d 361, 369 n. 12, 370 n. 13 (4th Cir.1980).

**11.** See General Elec. Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

**12.** See Levin, 730 F.2d at 996; Harriss v. Pan American World Airways, Inc., 649 F.2d 670, 673 (9th Cir.1980).

**13.** See authorities collected supra note 14.

**14.** See Harriss, 649 F.2d at 674 & n. 2; Burwell, 633 F.2d at 369–70 & nn. 12–14.

the first time on appeal.[15] The corollary of this rule is that, if a party hopes to preserve a claim, argument, theory, or defense for appeal, she must first clearly present it to the district court, that is, in such a way as to afford the district court an opportunity to recognize and rule on it.[16] The rationale for the rule was set out by the Supreme Court many years ago:

> [O]ur procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact. This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.[17]

■ Our review of the briefs submitted at the remedy-phase hearing persuades us that National never presented this argument to the district court, at least not in a clear fashion. Admittedly, National did maintain that White had been discharged on the basis of a nondiscriminatory policy and, further, did mention in its statement of the facts that White had been discharged for failing to comply with the notice provision. National never contended, however, that the district court's earlier liability-phase opinion had upheld the notice provision while striking down the stop provision; never specifically identified the allegedly nondiscriminatory policy as that set forth in the notice provision; and never directly contended that White was distinguishable from the other flight attendants on the ground that she alone had violated the notice provision. What National did say suggested a much different argument, namely, that because White had continued working past the point at which the district court, in its liability-phase opinion, had said that business necessity might have justified requiring pregnant attendants to stop flying (twenty weeks), she had violated a part of the stop policy that the district court had upheld and therefore was properly subject to discharge. This argument, and this one alone, was clearly before the district court at the remedy-phase hearing.

■ Even if PanAm's notice-provision argument were properly before us, however, it would not entitle National to relief from the district court's judgment. The premise underlying the argument—that the district court impliedly upheld, or at least did not pass on the legality of, the notice provision—is flawed. Although we acknowledge that there is room for disagreement on this matter, as we read the liability-phase opinion the district court found that White and the other plaintiffs had established a *prima facie* case of discrimination as to National's *entire* maternity-leave policy, including the notice requirement. Our conclusion rests on several considerations, including that in the statement of the facts the court described National's "current policy" as consisting of notice, stop-work, and start-work requirements; throughout the portion of the opinion devoted to the *prima facie* case issue, the court referred to "National's policy" rather than to separate "notice," "stop," or "start" policies; and at the end of that section of the opinion, the court concluded that the "defendant's policy" violated Title VII. The district court, therefore, did not separately consider and uphold the notice requirement.

We too read the entire maternity-leave policy as a whole, not as a series of separate and independent rules, each to be weighed discretely for discriminatory effect. Read in that way, the policy is discriminatory.

15. *Wu v. Thomas,* 847 F.2d 1480, 1484–85 (11th Cir.1988); *Troxler v. Owens–Illinois, Inc.,* 717 F.2d 530, 533 (11th Cir.1983).

16. *See Lim v. Central DuPage Hosp.,* 871 F.2d 644, 647–48 (7th Cir.1989); *Wallace Motor Sales v. American Motors Sales Corp.,* 780 F.2d 1049, 1067 (1st Cir.1985); *Libertyville Datsun Sales v.* *Nissan Motor Corp.,* 776 F.2d 735, 737 (7th Cir. 1985); *Nathan Rodgers Constr. & Realty Corp. v. City of Saraland,* 676 F.2d 162, 163 (5th Cir. 1982) (Unit B).

17. *Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941).

2

The second possible version of PanAm's absence-of-discrimination argument is an amplification of the argument that it presented to the district court at the remedy-phase hearing. Although the district court had found that National's maternity-leave policy was *prima facie* discriminatory, PanAm argues, the court accepted National's BFOQ defense of the notice and stop provisions *in part,* upholding the application of those provisions to flight attendants who have reached certain stages of pregnancy (the twentieth week). To the extent that the application of those provisions was upheld, the argument continues, the provisions are nondiscriminatory. White continued to work until at least the twenty-first week of her pregnancy before giving notice of her condition to her superiors, one week beyond the time at which National could lawfully have required her to give such notice and to stop work. Because she therefore violated the nondiscriminatory portions of the notice and stop provisions, PanAm concludes, her discharge cannot be considered unlawful.

The district court clearly did not conclude that National's BFOQ defense was sufficient to sustain the existing stop provision *as a whole;* in fact, the court's conclusion was to the contrary. Further, it appears that the court did not conclude that National's BFOQ defense was sufficient to sustain a *part* of that provision. The court did comment extensively about the stages of pregnancy at which, and the circumstances under which, National could, consistently with its BFOQ defense, lawfully force pregnant flight attendants to stop work. We do not, however, construe these comments as a holding that part of the *existing* stop provision was lawful, nor would we sustain such a holding. On the contrary, we are convinced that the court's remarks were intended to assist the parties, particulary PanAm, in constructing a *new* stop provision to replace the one struck down, a provision that would pass muster under Title VII.

Our interpretation of the court's remarks rests on two considerations. The structure of the court's discussion of the issues generated by National's BFOQ defense strongly indicates that the court did not uphold the stop provision in part. The court introduced its discussion of National's BFOQ defense with this remark:

> [T]his court must determine whether National has established its defense of BFOQ for maintaining its *current policy* of requiring that a stewardess stop flying as soon as she knows she is pregnant. *If the court determines that the present policy is not justified as BFOQ,* then the court must determine from the evidence at what stage of pregnancy, if any, *may a policy* requiring suspension of employment of flight attendants ... *be enforced....*[18]

As this statement suggests, the district court envisioned a two-stage inquiry. In the first, it would consider whether the existing stop policy was sustained by National's BFOQ defense. Assuming that it answered the first inquiry in the negative, it would proceed to the second stage: determining under what circumstances *"a policy"* like National's—not the current policy or some part of it—could be enforced without violating Title VII.

Further, we question whether it makes sense to talk, as PanAm does, of the district court's having upheld a "part" of the existing stop policy, namely, the "part" applicable to flight attendants who have reached certain advanced stages of pregnancy. National's stop policy did not exist in the abstract; it was embodied in a provision of a written labor-management agreement. That provision included a single, universally-applicable temporal element: a flight attendant had to stop flying *immediately* on learning of her pregnancy. There was, therefore, no discrete "part" of the existing policy that became applicable only after a flight attendant had reached a certain stage of her pregnancy.

This construction of the court's remarks regarding National's BFOQ defense in effect disposes of the second version of

---

**18.** *In re National Airlines, Inc.,* 434 F.Supp. 249, 262 (S.D.Fla.1977) (emphasis added).

PanAm's absence-of-discrimination argument. The district court concluded that National's existing notice and stop requirements were *prima facie* discriminatory and that National's BFOQ defense was not sufficient to sustain these integrally related requirements. White was discharged because she violated these requirements.

**3**

PanAm also seems to argue, however, that even if the district court did not uphold the existing "stop" and "notice" policies "in part," White has no legitimate claim for relief. As PanAm correctly points out, White continued working a few weeks past the point in time at which the district court said that National, had it had a valid policy, could have forced pregnant flight attendants to stop working. According to PanAm, if National had had such a policy during the relevant period and if White had behaved as she did under the old policy, White could have been lawfully discharged. Under these circumstances, the argument continues, awarding White relief gives her a windfall. PanAm suggests that White would deserve relief only if she could establish that she would have complied with a nondiscriminatory policy (and therefore would have behaved differently than she did under the old policy), and insists that White failed to carry her burden of proof on this point.

White bore no such burden. If we were to endorse PanAm's argument and to accept the rule regarding burden of proof on which it rests, we would place Title VII litigants like White in an almost impossible position. At the time of trial, it is difficult for one who has allegedly suffered discrimination to recreate the past, that is, to demonstrate what would have happened in the absence of discrimination. All of the employee's actions were taken against the backdrop of a discriminatory policy; her state of mind and attitudes developed in

response to the atmosphere of discrimination created by her employer. Not only would requiring plaintiffs like White to prove how they would have behaved in the face of a nondiscriminatory policy sometimes demand the impossible; it would also often be inequitable. It is the employer who created the discriminatory situation that unlawfully circumscribed the employee's choices [19] and whose past conduct makes it difficult to ascertain, after the fact, how the employee would have behaved in a nondiscriminatory environment.[20]

 Relying on such prudential and equitable considerations, we have refused, in cases analogous to the one presently before us, to condition the employee's entitlement to relief on her proving what would have happened in the absence of discrimination.[21] For similar reasons, we conclude that White was not required to prove, as a predicate for obtaining relief, that if National had had a lawful maternity leave policy, she would have complied with it by timely giving notice of her condition and stopping work. To establish a *prima facie* case for relief, it was sufficient that she prove that the existing maternity leave policy was discriminatory and that National acted against her on the basis of that policy.

In stating this conclusion, we do not mean to suggest that how White would have behaved in the absence of a discriminatory policy is irrelevant to the question of her entitlement to relief. On the contrary, if National had been able to prove that White would not have stopped work earlier no matter what the contents of its maternity leave policy or that her conduct would have violated some other nondiscriminatory company policy or practice, then White's right to relief would have been barred. Our point is simply that National, not White, bore the burden of proof on this issue.

**19.** *Cf. Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1380 (5th Cir.1974).

**20.** *Cf. Walker v. Ford Motor Co.,* 684 F.2d 1355, 1361 (11th Cir.1982).

**21.** *See Walker,* 684 F.2d at 1361 & 1362 n. 9; *Avery v. Homewood City Bd. of Ed.,* 674 F.2d 337, 340–41 (5th Cir.1982) (Unit B); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 259 (5th Cir.1974); *Johnson,* 491 F.2d at 1374–75, 1379–80.

### B

PanAm maintains that White was not a proper representative for the subclass of cabin flight attendants and, further, was not even a member of that subclass. Her claims, PanAm argues, were not "typical," for she, unlike the other discharged attendants, was discharged on the basis of a nondiscriminatory policy.

This argument lacks merit. The sole foundation on which National builds the argument that White was not a proper representative for or member of the subclass is the contention that, because she failed to give notice of her condition and to stop flying at a time when National could lawfully have forced her to do both, she was not a victim of discrimination. That contention we have already rejected. Its foundation removed, National's objection to White's status as a member of the subclass falls.

### C

PanAm contends that the district court lacked subject matter jurisdiction over White's claim. The argument in support of this contention proceeds as follows. National discharged White on the basis of her failure to comply with the portions of National's notice and stop policies that the district court found were not discriminatory. Lacking a valid Title VII claim, White could have complained of her discharge only on the ground that National had misapplied the notice or stop policy in terminating her. Because both of these policies were set out in a letter agreement between National and ALPA, a complaint about the proper application of either or both of these policies would have implicated the provisions of the Railway Labor Act (RLA),[22] in particular, those concerning the resolution of "minor" disputes.[23] The relevant provisions of the RLA give the designated adjustment board, not the district court, juris-

diction over such disputes.[24] Therefore, the district court lacked jurisdiction over White's claim.

We agree with White that there is no need to consider this argument. In order for the issue of jurisdiction posed by PanAm to arise at all, one must first conclude that (i) PanAm's argument that White was terminated pursuant to a nondiscriminatory policy is correct and (ii) White, were she to be convinced that she had no valid Title VII claim, would try to redenominate her claim as one for wrongful discharge under the provisions of the 1971 agreement. For reasons we have already explained, the first of these two conditions is not satisfied. The same is true of the second. In her brief White concedes that she has not made and does not intend to make any claim for relief under the Railway Labor Act and, further, that if she has not been injured by a policy or practice found to be unlawful under Title VII, then no remedy can be awarded. Consequently, consideration of the effect of the RLA on the district court's jurisdiction would require us to assume that White claims what she does not. We decline to do so.

### IV

We conclude that the district court did not err in awarding White relief under Title VII. The district court's judgment is therefore AFFIRMED.

---

**22.** 45 U.S.C. §§ 151–163, 181–185, 187–188 (1982 & Supp. V 1987).

**23.** *Id.* § 153; *see Elgin, J. & E. Ry. v. Burley,* 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945) (defining and distinguishing "major" and "minor" disputes).

**24.** 45 U.S.C. § 153, first (h), (i), (q); *see Andrews v. Louisville & Nashville R.R.,* 406 U.S. 320, 322, 92 S.Ct. 1562, 1564, 32 L.Ed.2d 95 (1972); *Minehart v. Louisville & Nashville R.R.,* 731 F.2d 342, 343–44 (6th Cir.1984).