**Rita ZUNIGA, Plaintiff-Appellant,**

v.

**KLEBERG COUNTY HOSPITAL, KINGSVILLE, TEXAS, Defendant-Appellee.**

**No. 81–2061.**

United States Court of Appeals, Fifth Circuit.

Dec. 6, 1982.

---

Texas Rural Legal Aid, Inc., Robert J. Parmley, Kerrville, Tex., for plaintiff-appellant.

Joan E. Bertin, New York City, amicus curiae, for American Civil Liberties Union Women's Rights Project, et al.

Gary, Thomasson, Hall & Marks, Richard A. Hall, Corpus Christi, Tex., for defendant-appellee.

Appeal from the United States District Court for the Southern District of Texas.

Before THORNBERRY, GEE and GARWOOD, Circuit Judges.

THORNBERRY, Circuit Judge:

This is a sex discrimination case. Rita Zuniga, an x-ray technician, appeals the decision of the district court that her rights under Title VII of the Civil Rights Act of 1964 were not violated when her employer, Kleberg County Hospital, terminated her employment upon learning that she was pregnant.

## I. FACTS

In July 1971, Rita Zuniga was hired by Kleberg County Hospital as an x-ray technician. She was the first female x-ray technician ever employed by the Hospital.

Two years later, in January 1973, Zuniga mentioned to Wayne Aycock, the Hospital's administrator, that she and her husband were planning to start a family. Aycock informed Zuniga that if she became pregnant, she would have to resign her position or be terminated. She was told that she would not be granted a leave of absence, and would not be entitled to either sick leave, the maternity benefits generally available to female employees, or her Blue Cross-Blue Shield insurance coverage. Aycock also told her that he could not guarantee her reemployment after the birth of her baby. At the time Zuniga was informed of this unwritten termination policy for pregnant x-ray technicians, the Hospital had a discretionary leave of absence policy applicable to all other employees which guaranteed them their jobs upon their return.[1] Zuniga, who was the only x-ray technician to become pregnant while Aycock was the Hospital's administrator, was also the only person ever denied a leave of absence during that period.

On May 8, 1973, Zuniga filed a charge with the Equal Employment Opportunity Commission [EEOC] alleging that Kleberg County Hospital's unwritten termination policy for pregnant x-ray technicians discriminated against women on the basis of sex.

On August 14, 1973, Zuniga discovered that she was pregnant and immediately informed Aycock of her condition. Aycock told her that she would have to resign or be fired. His decision was based solely on his concern over the possible effects of exposing the fetus to x-ray radiation, and his fear of a lawsuit against the Hospital by a future child.

Zuniga resigned on August 15, 1973. The Hospital offered her a job as a nurse's aide earning the minimum wage, which was substantially less than she earned as a technician. However, even that position did not become available until more than a month after Zuniga was fired. Although a vacancy did occur in the Hospital's x-ray department after the birth of Zuniga's child, she did not accept the Hospital's offer of reemployment at that time.

On April 23, 1976, the EEOC issued Zuniga a Notice of Right to Sue after informal methods of conciliation had failed. Zuniga filed suit against Kleberg County Hospital on July 20, 1976, alleging violations of section 703(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a),[2] and the equal protection clause of the fourteenth amendment. The case went to trial without a jury on February 13, 1980, and on January 23, 1981 the district court issued a final judgment for the Hospital. In its accompanying memorandum order, the court found that the Hospital had not discriminated against Zuniga on the basis of sex. The court concluded that the decision to terminate her was based on a valid business purpose that was not a pretext for sexual discrimina-

---

1. This policy was set out in a memorandum entitled "Personnel Policies," which provided as follows:

 6. *Leave of Absence:*
 a. Leave of absence is time off without pay granted at the discretion of the administration. The granting of leave will be dependent on whether the employee can be conveniently excused without disrupting the smooth running of a department. A leave of absence may be granted for such reasons as advanced study, personal or family health....
 15. *Maternity Leave:*
 Leave of absence for maternity and other long term illnesses may be granted by the Department Head, with the approval of the administrator, on an individual basis for more than sixty (60) days.

2. 42 U.S.C. § 2000e–2(a)(1), (2) provide:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex ....

tion.[3] The court also found that the Hospital's policy of prohibiting pregnant x-ray technicians from working in the x-ray department was the only effective means the Hospital had of carrying out its business purpose.[4]

## II. ANALYSIS

Zuniga raises two points of error on appeal. First, she argues that she established a prima facie case of sex discrimination below by showing that the Hospital's facially neutral policy of terminating pregnant x-ray technicians burdened women's employment opportunities without affecting those of men. Second, she asserts that the district court erred in finding that the Hospital established a valid business necessity defense to her prima facie case. We shall address these claims in the order in which they were raised.

 The scheme of proof in disparate impact cases provides that once the employee has proved a prima facie case, the burden shifts to the employer to show that the discriminatory practice is a "business necessity," *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), "necessary to safe and efficient job performance." *Dothard v. Rawlinson,* 433 U.S. 321, 331 n. 14, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977); *Clanton v. Orleans Parish School Board,* 649 F.2d 1084, 1097–98 (5th Cir.1981). Should the employer meet

its burden, the employee can overcome this defense by proving that the stated business necessity is merely a pretext for discrimination. *Connecticut v. Teal,* —— U.S. ——, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982); *Dothard,* 433 U.S. at 329, 97 S.Ct. at 2726–27; *Albemarle Paper Company v. Moody,* 422 U.S. 405, 425–26, 95 S.Ct. 2362, 2375–76, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973); *see Lerma v. Bolger,* 689 F.2d 589 (5th Cir.1982).[5] He may do this by showing that the employer could have used alternative practices to accomplish the same purpose without discriminatory effects. *Albemarle,* 422 U.S. at 125, 97 S.Ct. at 2375; *Clanton,* 649 F.2d at 1098; *Langley v. State Farm Fire & Casualty Co.,* 644 F.2d 1124 (5th Cir.1981).

### A. *Prima Facie Case*

 In *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the Supreme Court held that an employer disability plan which provided non-occupational sickness and accident benefits to all employees but excluded disabilities arising from pregnancy did not violate section 703(a) of Title VII unless the exclusion of pregnancy benefits was shown to be a pretext for discriminating against women.[6] However, consistent with its earlier

**3.** Although the trial court's holding that the decision to terminate Zuniga was based on a legitimate business purpose implies a prior finding that Zuniga made out a prima facie case of sex discrimination, *see deLaurier v. San Diego United School District,* 588 F.2d 674, 677 (9th Cir.1978), the court did not explicitly hold in its memorandum order that a prima facie case had been proved.

**4.** The district court further found that the Hospital did not force Zuniga to resign in retaliation for her filing a claim with the EEOC, and that the forced resignation did not violate her rights under the equal protection clause. Neither of these findings is before us on appeal.

**5.** Since proof of discriminatory motive is not required in a discriminatory impact case, *see* note 7 *infra,* we understand the Supreme Court's reaffirmation in *Teal* of the requirement that pretext be shown in order to overcome a business necessity defense to require

something less than proof of actual discriminatory intent or motive.

**6.** The events in our case all occurred prior to October 31, 1978, the effective date of the Pregnancy Discrimination Act, Pub.L. 95–555, § 1, 92 Stat. 2076 (1978). The Act amended Title VII through the addition of section 701(k), which prohibits discrimination in employment "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k) (Supp. III 1979). The Act effectively overturned the result in *Gilbert* by providing that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related programs, *including receipt of benefits under fringe benefit programs,* as other persons not so affected but similar in their ability or inability to work." *Id.* (emphasis added). The Pregnancy Discrimination Act does not apply to the present case.

decisions, *see, e.g., Washington v. Davis,* 426 U.S. 229, 247, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976); *Griggs,* 401 U.S. at 431, 91 S.Ct. at 853 (1971), the Court held open the possibility of establishing a prima facie case of sex discrimination by showing that a facially neutral plan or classification had the *effect* of discriminating against the members of one class or another. *Gilbert,* 429 U.S. at 125, 97 S.Ct. at 408.[7]

This alternative means of establishing a violation of section 703(a) was first applied in a sex discrimination case the following year in *Nashville Gas Company v. Satty,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977). There, the Court held that although an employer's policy of denying accumulated seniority to women returning from pregnancy leave was neutral on its face in its treatment of male and female employees, it nevertheless violated section 703(a)(2) because its effect was to discriminate against women. The Court distinguished *Gilbert* as holding only that women were not entitled to special, additional benefits denied men.

Here, by comparison, petitioner has not merely refused to extend to women a benefit that men cannot and do not receive, but has imposed on women a substantial burden that men need not suffer. The distinction between benefits and burdens is more than one of semantics. We held in *Gilbert* that § 703(a)(1) did not require that greater economic benefits be paid to one sex or the other "because of their differing roles in 'the scheme of human existence,'" 429 U.S. at 139, 97 S.Ct. at 410 n. 17. But that holding does not allow us to read § 703(a)(2) to permit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role.

Id. at 142, 97 S.Ct. at 351.

In *Clanton v. Orleans Parish School Board,* 649 F.2d 1084 (5th Cir.1981), this Court held that a school board's teacher reinstatement policy violated section 703(a)(2) by vesting discretion in the superintendent of schools to determine when a teacher could return from maternity leave, while granting him no concomitant discretion with respect to teachers returning from sick leave. In that case, we read *Satty* to stand for at least the following two propositions:

(1) [A] pregnancy-based classification, though neutral on its face, violates § 703(a)(2) of Title VII when its effect is to discriminate on the basis of sex and no showing of sex-based intent is required; and (2) a pregnancy-based classification that has the effect of depriving women of "employment opportunities" or of "adversely affect[ing] [their] status as an employee" [ . . . ] "impose[s] on women a substantial burden that men need not suffer," 434 U.S. at 142, 98 S.Ct. at 351, and, therefore, constitutes sex-based discrimination violative of § 703(a)(2) of Title VII.

Id. at 1096. In *Clanton,* the Board's unique discretionary reinstatement policy for postpartal teachers conditioned their reemployment in such a manner as to deny them employment opportunities because of their pregnancy. Far from merely withholding from women potential benefits that men could not enjoy, this policy actually imposed

---

**7.** In these cases lie the origins of the disparate impact theory of sex discrimination, frequently confused in the case law with the disparate *treatment* theory. Under the disparate treatment theory, plaintiff normally must prove that an employer treated him less favorably than some other employee because of his race, color, religion, sex or national origin. An essential element of the disparate treatment case is proof of discriminatory motive. Discriminatory motive or intent need not be proved, however, in cases alleging disparate impact. *See Connecticut v. Teal,* ⸻ U.S. ⸻, 102 S.Ct. 2525, 2537 [73 L.Ed.2d 130] (1982) (Powell, J.

dissenting). *Compare Griggs,* 401 U.S. at 430–32, 91 S.Ct. at 853–54, *with McDonnell,* 411 U.S. at 802–06, 93 S.Ct. at 1824–26. Disparate impact cases are characterized by facially neutral employment policies or practices which "fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). *See also Burwell v. Eastern Air Lines,* 633 F.2d 361, 369 (4th Cir.1980) (per curiam), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981).

on women a substantial burden that men did not have to suffer. *Id.* at 1097.

■ Applying the rules of *Satty* to the facts of the present case, we conclude as a matter of law that Zuniga established a prima facie case of sex discrimination under section 703(a)(2) of Title VII. The Hospital's unwritten policy requiring pregnant x-ray technicians to resign or be terminated without any guarantee of reinstatement deprives them of employment opportunities in the most clear-cut fashion imaginable, by permanently taking away their jobs. Depriving a woman of her job because she is pregnant can in no way be characterized as the withholding of a benefit that men cannot and do not receive. *See Satty* at 142, 98 S.Ct. at 351. Rather, it imposes on women a heavy burden which no man is ever likely to suffer. The Hospital's policy thus satisfies the requirements of a prima facie case of sex-based discrimination under section 703(a)(2) of Title VII.[8]

Our conclusion that Zuniga made out a prima facie case of sex discrimination under section 703(a)(2) does not, of course, end our inquiry. Here, the Hospital argues that potential harm to the fetus from ionizing radiation and the possibility of a tort suit by a future damaged child constituted a business necessity which justified its termination of Zuniga's employment.

**B. Business Necessity Defense**

The business necessity defense had its origins in discriminatory hiring cases involving employer reliance on criteria allegedly related to the employee's job performance. In *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) the Supreme Court held that a high school diploma requirement and written examination which acted to exclude a disproportionately high number of blacks from employment opportunities was insufficiently related to job performance to qualify as a business necessity. *Id.* at 431, 91 S.Ct. at 853. Applying the same reasoning in *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Court held that statutory height and weight requirements that operated to disqualify a disproportionately high percentage of female applicants for jobs as prison guards were not justified as a business necessity because they had not been shown to be necessary to efficient job performance. Although the Supreme Court has only implied that "business necessity" need not be synonymous with "job-relatedness," *see, e.g., Satty,* 434 U.S. at 143 n. 5, 98 S.Ct. at 352; *Teamsters v. United States,* 431 U.S. 324, 349, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1976), at least one circuit has expanded its inquiry beyond the bounds of mere "job-relatedness," ask-

---

**8.** It is difficult to conceive of a more straightforward prima facie case of sex discrimination under 703(a)(2). Both this and other circuits have repeatedly found the requirements of a prima facie case to be satisfied by far less serious deprivations. *See, e.g., Langley v. State Farm Fire & Casualty Co.,* 644 F.2d 1124 (5th Cir.1981) (employer's policy of requiring employee to return to work 60 days after delivery of child substantially restricts her employment opportunities because an employee unable to return to work within that period could be fired); *Harper v. Thiokol Chemical Corp.,* 619 F.2d 489 (5th Cir.1980) (employer's policy of requiring women who had been on pregnancy leave to have sustained a normal menstrual cycle before they could return to work violative of § 703(a)(2)); *Burwell v. Eastern Air Lines,* 633 F.2d 361 (4th Cir. 1980) (*per curiam*), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981) (airline's mandatory pregnancy leave policy for flight attendants during first 13 weeks of pregnancy violated their Title VII

rights); *In re Southwestern Bell Telephone Co. Maternity Benefits Litigation,* 602 F.2d 845 (8th Cir.1979) (employer's policy of failing to guarantee job reinstatement to female employees returning from maternity leave while ensuring reinstatement to employees returning from disability leave violates § 703(a)(2)); *deLaurier v. San Diego School Dist.,* 588 F.2d 674 (9th Cir. 1978) (school district policy requiring pregnant teachers to go on leave at commencement of ninth month of pregnancy violates § 703(a)); *Pennington v. Lexington School Dist.,* 578 F.2d 546 (4th Cir.1978) (employer's reinstatement policy requiring physically fit female teachers to remain on leave for entire school year after pregnancy while allowing employees absent for other disabilities to return to work constitutes sex discrimination); *Roller v. City of San Mateo,* 572 F.2d 1311 (9th Cir.1977) (city policy requiring policewoman to take unpaid sick leave after third month of pregnancy violates § 703(a)).

ing "whether there exists an overriding legitimate business purpose such that the practice is *necessary to the safe and efficient operation of the business." Robinson v. Lorillard Corp.,* 444 F.2d 791, 798 (4th Cir.), *cert. denied,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 665 (1971) (emphasis added); *cf. Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 246 n. 91 (5th Cir.1974), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979).[9]

### C. Less Discriminatory Alternative

■ We need not consider here whether concern over the health of the fetus and fear of liability for damage to a future child justified Zuniga's termination as "necessary to the safe and efficient operation of the business." *Robinson,* 444 F.2d at 798.[10] Even if the business necessity defense does extend to the preservation of fetal health or the avoidance of tort liability, we find that Zuniga has effectively revealed the alleged business necessity to be a mere pretext for discrimination by showing that the Hospital failed to utilize an available, alternative, less discriminatory means of achieving its business purpose. *See Dothard,* 433 U.S. at 329, 97 S.Ct. 2727; *Albemarle,* 422 U.S. at 425, 95 S.Ct. at 2375; *Clanton,* 649 F.2d at

1098; EEOC Decision No. 75–072, EEOC Dec. ¶ 6442 (1974). The Hospital could have avoided terminating Zuniga's employment while protecting itself and the fetus by granting Zuniga a leave of absence in accordance with its own established policies.

At the time Zuniga was forced to resign, the Hospital had a formal policy governing leaves of absence. Although this policy applied to all personnel, Hospital administrator Aycock specifically excepted Zuniga from its coverage because he believed it would be too difficult to find a female x-ray technician to replace her temporarily.[11] He testified, and the trial court found, that the Hospital "could not guaranty Mrs. Zuniga immediate reemployment after the birth of her child since the hospital was small, is located in a small community and it would be difficult to find an x-ray technician who would accept full-time employment in Kingsville only until Mrs. Zuniga returned to work."

We may not, of course, simply disregard the trial court's factual findings. A district court's findings of fact will not be followed only when they are "clearly erroneous." Fed.R.Civ.P. 52(a).[12] In the oft-quoted language of the Supreme Court:

**9.** We note in passing that the *Robinson* Court's requirement that the *employer disprove* the existence of any less discriminatory alternative for carrying out its business purpose does not comport with the Supreme Court's approach in a recent discriminatory treatment case, *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Burdine,* the Court reaffirmed the basic allocation of burdens and order of presentation of proof set out in *Dothard,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977) and *Albemarle,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), under which the employee has the burden of establishing the existence of a less discriminatory alternative.

**10.** Although concern over fetal health alone is arguably not the province of the employer, but of the mother, *see, e.g., Burwell v. Eastern Air Lines,* 633 F.2d 361, 371 (4th Cir.1980) (*per curiam*), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981); *In re National Air Lines,* 434 F.Supp. 249, 259 (S.D.Fla.1977), the economic consequences of a tort suit brought against the Hospital by a congenitally malformed child could be financially devastating, seriously disrupting the "safe and efficient op-

eration of the business." *Robinson,* 444 F.2d at 798. *But see Hayes v. Shelby Memorial Hospital,* 546 F.Supp. 259, 29 Fair Empl.Prac.Cas. (BNA) 1173, 1175 (N.D.Ala.1982).

**11.** Since Zuniga was Kleberg County Hospital's first female x-ray technician ever, the Hospital's insistence that her temporary replacement be female appears somewhat overstated.

**12.** Citing *Rowe v. General Motors Corp.,* 457 F.2d 348, 356 n. 15 (5th Cir.1972), Zuniga also argues that since the trial court failed to elucidate the legal standard of proof it was applying, either disparate impact or disparate treatment, the hybrid standard actually applied was incorrect, and this Court is free to make its own findings unconstrained by the clearly erroneous rule of Fed.R.Civ.P. 52(a). Although analysis of the trial court's memorandum order does not persuade us that an erroneous legal standard was applied, we note that where an incorrect legal standard is applied at trial, the Supreme Court's recent opinion in *Pullman-Standard v. Swint,* —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), precludes us from making independent findings of fact except

A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Similarly,

where the evidence would support a conclusion either way but ... the trial court has decided it to weigh more heavily for the defendant[,] [s]uch a choice between two permissible views of the weight of evidence is not "clearly erroneous."

*United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

We think the trial court clearly erred in making this finding. Aycock testified at trial that the x-ray department had a high turnover rate, indicating that replacements had been found regularly in the past. When asked how he went about finding these replacements, Aycock testified that his policy was to "call all the people you know, call the schools, call different states all over, and so on ... " but professed ignorance of the existence of an x-ray technician school at Spohn Hospital, a mere 45 miles distant. Zuniga herself attended the x-ray technician school at Spohn before she was hired by Kleberg County Hospital. Aycock could not have tried very hard to determine how difficult it might be to find a replacement for Zuniga. Indeed, when asked if he knew of any x-ray technicians' schools in South Texas, he answered, "Beats the heck out of me. I don't know." We fail to see how a hospital with a high x-ray technician turnover rate, located 45 miles from the x-ray technician school which had supplied its most recently hired employee, could not have found a temporary replacement for that employee during her leave of absence. There is no evidence to show that Aycock even tried to explore the possibility of finding a temporary replacement for Zuniga before he decided that replacing her was just too difficult, and instead ordered

where the record permits of only one resolution of the disputed issues. *Id.* at 1792.

her to resign or be fired. The trial court's finding that a vacancy did occur in the Hospital's x-ray department after the birth of Zuniga's child supports our conclusion that the Hospital could have relied upon the "alternate acceptable practice" of granting her a leave of absence with guaranteed reinstatement after her child was born. *See Pettway,* 494 F.2d at 246. Whatever minor difficulty the Hospital may in fact have encountered in replacing her during the period she was away cannot be accepted as a justification for a practice which does not produce the least discriminatory impact possible.

The trial court also found that the "Hospital's policy of not holding open the position of x-ray technician for employees who took leaves of absence was not unique to Mrs. Zuniga or to women in general." The court cited as the source of this finding a sentence from the "Personnel Policies" memorandum to the effect that the granting of leave was dependent upon whether the employee could be conveniently excused without disrupting the smooth running of the department. We have already concluded that the trial court clearly erred in finding that a temporary replacement for Zuniga could only be found with difficulty. Coupled with Aycock's testimony that he had never denied an application for a leave of absence for medical reasons until Zuniga requested one, this conclusion leads us to reject the finding that the Hospital's policy was not unique to Zuniga.

Further examination of the Hospital's guidelines for leaves of absence reveals that Zuniga presented an exceptionally strong case for such a leave. The "Personnel Policies" memorandum states that "[a] leave of absence may be granted for such reasons as advanced study, personal or *family health.*" (Emphasis added). The prevention of "fetal death, congenital abnormalities, small head, mongolism, or missing organs" [13] in one's child presents a rather compelling case for the granting of a leave of absence on the basis of "family health." The very reason cited by the Hospital for terminating

**13.** The trial court found that "x-ray damage to a fetus results from ionizing radiation, which is cumulative; the result may be fetal death, con-

Zuniga, fear of injury to her unborn child, would have justified granting her a leave of absence under the Hospital's own written policies. Having been granted a leave of absence, Zuniga would also have been entitled to the accumulated sick leave, maternity benefits and insurance coverage available to all other employees.

## III. CONCLUSION

Because the Hospital failed to utilize an alternative, less discriminatory means of achieving its stated goal, its business purpose stands revealed as a pretext, and its business necessity defense must fail. Zuniga's termination, and the resultant controversy, could easily have been avoided by the simple expedient of treating Zuniga no differently from all the other employees eligible under the Hospital's leave of absence policy. The bare assertion that an unexplored, less discriminatory means of achieving an employer's business purpose entails difficulties cannot justify rejecting that alternative in favor of a policy which clearly discriminates against women.

REVERSED AND REMANDED.

genital abnormalities, small head, mongolism, or missing organs, depending on the cell that