INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, et al., Plaintiffs,

v.

JOHNSON CONTROLS, INC., Defendant.

No. 84–C–472.

United States District Court, E.D. Wisconsin.

Jan. 21, 1988.

As Amended Feb. 24, 1988.

Miriam Horwitz, Zubrensky, Padden, Graf & Maloney, Milwaukee, Wis., for plaintiffs.

Stanley S. Jaspan, Foley & Lardner, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

WARREN, Chief Judge.

This case presents the issue of whether a fetal protection policy which prohibits women who are capable of bearing children from working in jobs where there is a likelihood that their blood lead[1] levels will rise above 30 micrograms violates Title VII of the 1964 Civil Rights Act. Defendant, Johnson Controls, Inc. ("Johnson Controls") has filed a motion for summary judgment. After carefully reviewing all the submissions from both parties and the law on this issue, it is the Court's conclusion that the fetal protection policy at issue does not violate Title VII, and the defendant's motion for summary judgment is hereby GRANTED.

### I. Background Facts

Defendant has seventeen plants in its battery division. Fourteen of these plants manufacture batteries. Lead is the principal active material used in batteries. It is the main ingredient in the paste which forms the plates of the batteries, and it forms the structure for all the conductive elements in the battery for transmitting current.

On February 25, 1985, as a result of a stipulation between the parties, the Court certified the following class: all past, present and future production and maintenance employees employed in bargaining units represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, and/or one of its Local Unions at Defendant's Battery Division plants located in Garland, Texas; Holland, Ohio; Fullerton, California; Owosso, Michigan; Louisville, Kentucky; Texarkana, Arkansas; Bennington, Vermont; Middletown, Delaware; and Atlanta, Georgia, who have been and continue to be affected by Defendant's Fetal Protection Policy implemented in 1982.

The policy at issue was implemented in 1982 by the defendant. The policy excludes women who are capable of bearing children from working in jobs where their blood lead level will rise above 30 micrograms. Women are presumed capable of bearing children until they medically prove contrary. Women who are required to transfer out of jobs because of the policy are paid medical removal protection benefits to compensate for lost earnings. Women who are in positions where their blood lead levels do not rise to 30 micrograms are prohibited from transferring into positions where their blood lead levels will rise above 30 micrograms.

The plaintiffs allege that this policy discriminates against both women and men. Based on this policy plaintiffs allege that there is sex discrimination in recruitment and hiring, job assignments, wages, promotions and transfers within the bargaining unit, seniority, overtime, layoff and recall, demotions, on-the-job training, maternity policies, on-the-job harassment, fringe benefits, and health and safety conditions.

There is no dispute between the parties regarding the fact that excessive exposure to lead can result in significant harm to persons. There is a dispute, however, on the issues of whether there is a significant risk of harm to the fetus from lead exposure and whether that risk is substantially confined to the offspring of females, as opposed to male workers. There is also a dispute as to whether a fetus is more sensitive to lead than a post-natal child. Depositions and affidavits of experts have been submitted by plaintiffs and defendant, and the Court has closely reviewed those documents. Following is a brief summary of the testimony of the experts.

### A. Expert Opinions

Dr. Anthony R. Scialli is a practicing physician and director of the Reproductive Toxicology Center. The Center serves as a source of information on the potential reproductive toxicity of environmental and physical agents. Dr. Scialli holds the opinion that because a fetus undergoes extremely rapid development of the internal nervous system during gestation, the fetus is even more sensitive to the effects of lead

---

1. A word frequently used by the experts is blood lead. Blood lead is a measure of the amount of lead that is present in the circulation where venous blood is drawn.

than a young child. Dr. Scialli further stated that damage of the central nervous system includes intellectual and motor retardation, behavioral abnormalities and deficiencies in learning abilities which may be permanent. According to the affidavit, Dr. Scialli is aware of no studies which show that male blood lead levels of up to 50 micrograms results in any abnormality of offspring, and further that lead does not cause any change in the sperm that would be transmitted to offspring and result in abnormality in the offspring. Finally, the affidavit states that a man with a blood lead level of 50 micrograms would not have an increased risk of fathering a child with abnormalities.

Dr. J. Julian Chisolm who is a pediatrician and director of the Lead Program at the John F. Kennedy Institute set forth the following opinion:

During pregnancy the lead in the mother's blood transfers across the placenta to the fetal circulation. The concentration of lead in the fetal tissue increases rapidly during the last trimester of pregnancy. At birth, the fetus generally has the same blood lead level as the mother. However, the fetus is medically judged to be at least as sensitive, and, indeed, is probably even more sensitive to lead than the young child. This is particularly true during the latter part of the gestation period when the central nervous system of the fetus is developing very rapidly and is extremely susceptible to the toxic effects of lead. Medical studies released in the last year or two out of Boston, Cincinnati and Port Pirie, South Australia suggest that exposure to the fetus of blood lead levels as low as 10 micrograms presents [a] grave risk of permanent harm to the central nervous system of the fetus. The risk of harm to the fetus increases proportionately with the increase of blood lead levels over 10 micrograms. Such harm includes stillbirth, reduced birth weight and gestational age, and retarded cognitive development which may result in learning deficiencies and behavioral disorders.

There is no medical evidence that lead exposure to the adult, male or female, has any adverse effect on the offspring. Rather, the available medical evidence establishes that it is the exposure directly to the fetus, through the pregnant woman, which causes harm to the offspring.

Likewise, the affidavit of Paul B. Hammon, Professor of Environmental Health at the University of Cincinnati and director of a study currently being conducted in Cincinnati of the effects of lead exposure on children, stated that he was unaware of any human studies which conclude that blood lead levels of up to, and even exceeding, 50 micrograms in the adult male will cause any demonstrable effect on the development of the fetus.

The deposition of Seymore Legator, professor and director of the division of environmental toxicology was submitted wherein Professor Legator states that there is "no question that lead is hazardous to the fetus by embryo exposure" and that children are very sensitive to lead. Professor Legator also stated that lead poses a threat to both men and women, but it is still unknown about male sensitivity, but he recognized that there is a problem and that lead probably causes a genetic lesion during spermatogenesis.

Another physician, M. Donal Whortin, is the Senior Occupational Physician/Epidemologist for a company that conducts research in the areas of occupational and environmental health and is a primary medical consultant for a number of companies. Dr. Whortin holds the opinion that "the current OSHA lead standard of 50 micrograms per deciliter of whole blood should generally protect adults of either sex from significant adverse effects in the various adult systems." Dr. Whortin was a coinvestigator in a 1981 study which compared the quality of the semen of lead exposed workers with non-exposed males. The study discovered no changes in the semen quality of lead exposed workers. Nevertheless, Dr. Whortin stated that recent medical studies have shown that a fetus' central nervous system can be injured by exposure to blood lead levels of 10 micrograms. Dr. Whortin concluded that

the central nervous system of the fetus and not the reproduction systems of the male or female worker is at greatest risk.

The testimony of Charles W. Fishburn was also submitted for purposes of the motion. Dr. Fishburn is a physician and Assistant Clinical Professor at the University of Wisconsin. Dr. Fishburn is certified in occupational medicine. Occupational medicine involves the study of the relationships of injury and disease caused by chemical exposures in occupations. He states that children are particularly sensitive to lead because children do not have a barrier between the brain and the blood. Further, children develop a barrier around the age of five. Until the barrier is developed, if children ingest lead, they can be poisoned immediately. The child also can go into convulsions resulting in damage to the central nervous system.

In a fetus, the central nervous system is one of the first systems that develops and the first to be affected. A fetus gets its blood from the mother and there is no way, according to Dr. Fishburn, to protect a fetus when it is overexposed to lead. Dr. Fishburn states that damage to the central nervous system is apparently permanent.

Michael Silverstein, an Occupational–Health Physician in the Health and Safety Department of the United Auto Workers, is of the opinion that there is no evidence that reproductive risks are different for men and women at equal blood-lead levels. Furthermore, Dr. Silverstein states that "the toxic effects of lead exposure on human adults is similar and equivalent in impact to that observed in children at equivalent exposure levels." Dr. Silverstein discussed one study published in 1972, Hilderbrand, where it was found that male rats with blood levels between 14 and 26 resulted in impotence and a decrease in sperm mobility. Dr. Silverstein stated that it could be speculated that an abnormal sperm could carry damaged genetic material which could result in damaged offspring or functional infertility.

Assistant Professor of Occupational Medicine at the University of Michigal School of Public Health, Kelly Ann Brix, states the conclusion, based upon a review article, that there is a clear effect of lead upon the male reproductive tract in mammals.

Ellen Silbergeld, a toxicologist and a senior scientist for the environmental defense fund, holds the opinion that all persons should not be exposed to lead levels above 12 micrograms.[2] Silbergeld also states that there is no evidence that a fetus is more sensitive than a post-natal child. Further, in animals, Silbergeld states, that high doses of lead in the first trimester can cause spontaneous abortion of an embryo. Silbergeld also stated that "a woman may be exposed to lead early in pregnancy and deficits noted in the child after birth, but those deficits might have been associated with the on-going exposure which occurred in the late stages of pregnancy ... [because] for all purposes there is a continuing exposure to lead even after removal from sources of lead...." Silbergeld estimated that if a person, after exposure to lead, is placed in a lead-free environment, the turnover of lead is about 100 days, "so within a year or so there would be a reduction in lead." This time estimate according to Silbergeld is accurate in a lead-free environment, but in the absence of a lead-free environment, there is a continuing exposure to lead.

## II. Prior Law

There are essentially two types of Title VII cases: Disparate treatment and disparate impact. Disparate treatment occurs when an employee has been treated less favorably because of sex. There are two types of disparate treatment cases: facial and pretextual. "Facial discrimination occurs when an employer adopts a policy that explicitly treats some employees differently from others on the basis of race, religion, national origin, or gender (pregnancy)." *Hayes v. Shelby Memorial Hosp.*, 726 F.2d 1543, 1547 (11th Cir.), *reh'g denied*, 732 F.2d 944 (11th Cir.1984). The

---

**2.** Silbergeld also states that "I think the blood leads that are called for monitoring are much too high, and I also don't understand why it applies only to women."

only defense to a charge of facial discrimination is a bona fide occupational qualification (BFOQ). A second theory under disparate treatment occurs when the employer adopts a facially neutral policy, but which is a pretext for discrimination. A disparate impact suit exists when although a policy is neutral, it has a disparate impact on a protected class. Discriminatory motive is not required, and the defense to an allegation of disparate impact is business necessity.

Only three jurisdictions have reviewed Title VII actions involving the health of the fetus.[3] The Fourth Circuit Court of Appeals was the first circuit court to address the fetal vulnerability program in *Wright v. Olin Corp.*, 697 F.2d 1172, 1177 (4th Cir.1982). Olin Corporation instituted a fetal vulnerability policy which restricted fertile females from jobs which required contact with toxic chemicals. The Fourth Circuit determined that the disparate treatment analysis was inappropriate for this particular case because under disparate treatment, the plaintiff must show that the employer intended to treat the class less favorable. The *Wright* court stated:

Here the claim is that the intention to "treat less favorably" is manifest in the very nature of the program and the factual defense is not truly aimed at rebutting that indisputable fact but at justifying it on the basis that the purpose behind it was benign in relation to the claimant's sex.

697 F.2d at 1185 n. 20. The court stated that the disparate impact theory with the business necessity defense was appropriate. The court held that the fetal protection policy establishes a prima facie case of discrimination. The court went on to find,

however, that a business necessity defense existed in this situation by analogizing the fetus to invitees and licensees who are legitimately on the business premises. The court stated that "the safety of unborn children of workers would seem no less a matter of legitimate business concern than the safety of the traditional business licensee or invitee upon the employer's premises." 697 F.2d at 1189.

The Fifth Circuit was the next circuit to address the issue of fetal protection in *Zuniga v. Kleberg County Hospital*, 692 F.2d 986 (5th Cir.1982). In *Zuniga*, a female x-ray technician was terminated from employment because of the effects of exposure of the fetus to x-ray radiation, and the concern of future liability of the hospital to the child. The Fifth Circuit found that the plaintiff rebutted the business necessity defense by showing that the hospital failed to utilize less discriminatory means. *Id.* at 992.

The next circuit to address this issue was the Eleventh Circuit in *Hayes v. Shelby Memorial Hospital*, 726 F.2d 1543 (11th Cir.), *reh'g denied*, 732 F.2d 944 (11th Cir. 1984). *Hayes* also involved a plaintiff who was a female x-ray technician and who was fired because she was pregnant. The Eleventh Circuit reviewed the case under both the disparate treatment analysis and the disparate impact analysis. Under the disparate treatment analysis, the court did not find that an analysis of pretextual discrimination was appropriate because the plaintiff was fired because of her pregnancy. A BFOQ defense could not be established because there was no evidence that plaintiff's pregnancy would interfere with her ability to perform her job and the hospital failed to provide evidence that the level of radiation to which the plaintiff would be exposed

---

3. Despite a lack of case law on this issue, many legal writers have addressed the issue. *See generally,* Comment, *Maternal Liability: Courts Strive to Keep Doors Open to Fetal Protection— But Can They Succeed?,* 20 J. Marshall L.Rev. 747 (1987); Comment, *Gender Specific Regulations in the Chemical Workplace,* 27 Santa Clara L.Rev. 353 (1987); Buss, *Getting Beyond Discrimination: A Regulatory Solution to the Problem of Fetal Hazards in the Workplace,* 95 Yale L.J. 577 (1986); Timke, *Exploring the Limits of Legal Duty: A Union's Responsibilities with Re-* *spect to Fetal Protection Policies,* 23 Harv.J. on Legis. 159 (1986); Comment, *Fetal Protection Programs under Title VII—Rebutting the Procreation Presumption,* 46 U.Pitt.L.Rev. 757 (1985); Note, *Wright v. Olin Corp.: Title VII and the Exclusion of Women from the Fetally Toxic Workplace,* 62 N.C.L.Rev. 1067 (1984); Williams, *Firing the Woman to Protect the Fetus: The Reconciliation of Fetal Protection with Employment Opportunity Goals under Title VII,* 69 Geo.L.J. 641 (1981).

posed an unreasonable risk of harm to the fetus.[4]

The Court, however, found that a facial discrimination analysis was proper. A presumption of facial discrimination applies when the policy at issue only applies to women. "That presumption may be rebutted, however, if the employer can show that although its policy applies only to women, the policy is neutral in the sense that it effectively and equally protects the offspring of all employees." *Hayes*, 726 F.2d at 1548.

The *Hayes* court went on to state that even if the employer proves that the policy is justified in a scientific basis and is not required to protect the offspring of male employees, the policy still has a disproportionate impact on women; only women are excluded from the jobs. The *Hayes* court stated that the plaintiff established an automatic case of disparate impact for which the defendant must raise a business necessity defense.

The business necessity defense is generally related to job performance. The *Hayes* court recognized that fetal protection does not have any relation to job performance. The court, however, did not find that the business necessity defense does not apply, but rather found that "the defense in a fetal protection case is justified by a genuine desire to promote the health of employee offspring...." *Id.* at 1552–53 n. 15. The court went on to further hold that the business necessity defense "automatically" applies because at the point where the court undertakes a disparate impact analysis, the employer "has *already* proved—to overcome the presumption of facial discrimination—that its policy is justified on a scientific basis and addresses a harm that does not affect men." *Id.* at 1553. If a business necessity defense exists, the burden then shifts to

the plaintiff to show that there are no "acceptable alternative policies that would better accomplish the purposes of promoting fetal health, or that would accomplish the purpose with a less adverse impact on one sex." *Id.* In brief three elements were set forth by the *Wright* court for reviewing a fetal protection policy:

(1) that a substantial risk of harm exists;

(2) that the risk is borne only by members of one sex; and

(3) that the employee fails to show that there are acceptable alternative policies that would have a lesser impact on the affected sex.

*Id.* at 1554. If these three elements are met, the policy does not violate Title VII.

## III. Analysis

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A factual dispute will not preclude summary judgment unless the fact is "outcome determinative according to the governing law." *Reardon v. Wroan*, 811 F.2d 1025, 1027 (7th Cir.1987).

### A. Disparate Treatment

Reviewing this case under a disparate treatment analysis results in the conclusion that the plaintiffs have established a prima facie case of discrimination because the fetal protection policy excludes women from positions which men are not excluded from. The *Hayes* court stated that there is a *"presumption* that if the employer's policy by its terms applies only to women, then the policy is facially discriminatory." 726

---

4. The *Hayes* court further noted:
   Because the Hospital failed to prove its policy was necessary we need not reach the factual issue of whether x-ray radiation affects the offspring of employees only through pregnant women, or whether similar effects can occur from exposure to males. Documents cited by amici do suggest that radiation induced mutations can pass to offspring from male sperm,

but neither party developed on this issue at trial.
*Hayes v. Shelby Memorial Hosp.*, 726 F.2d 1543, 1552 (11th Cir.), *reh'g denied*, 732 F.2d 944 (11th Cir.1984). The parties in this case have, however, submitted affidavits and depositions regarding the effects males exposed to lead and their offspring.

F.2d at 1548. This presumption is rebutted by demonstrating that there are "significant risks of harm to the unborn children of women workers from their exposure during pregnancy to toxic hazards in the workplace make necessary, for the safety of the unborn children, that fertile women workers though not men workers, be appropriately restricted from exposure to those hazards and that its program of restriction is effective for the purpose." *Wright,* 697 F.2d at 1190; *Hayes,* 726 F.2d at 1548.

In the present case, there is a disagreement among the experts regarding the effect of lead on the fetus and the effect of lead on male and female reproduction. This dispute, however, is not outcome determinative. The Fourth Circuit stated:

> To establish the requisite degree and cast of the risk of harm, it is not necessary to prove the existence of a general consensus on the points within the qualified scientific community. If suffices to show that within that community there is so considerable a body of opinion that significant risk exists, and that it is substantially confined to women workers, that an informed employer could not responsibly fail to act on the assumption that this opinion might be the accurate one.

The expert opinion in this case demonstrates that there is a considerable body of opinion which holds that lead is hazardous to the fetus through embryo exposure, and a fetus that is exposed to lead carries the significant risk that the central nervous system will be damaged. Further, a significant opinion exists which holds that the fetus cannot be protected when it is overexposed to lead from the mother's blood. Although plaintiffs state that today "reproduction is now largely discretionary," Dr. Chisolm stated that many pregnancies are unplanned. It is very likely that a women could be pregnant without being aware of it. If this women has a blood lead level of above 10 micrograms, her child could be born with abnormalities even if, after she discovers that she is pregnant, she removes herself from the lead environment because the fetus has been exposed to lead during early development when the central nervous system was developing. Also, lead remains in the body for a significant period of time. Furthermore, lead builds up in the blood, soft tissues, and bones. If the lead leaves the blood and soft tissues, lead still remains in the bones; it takes even longer for the lead to leave the bones. According to the experts, it takes about two or three times as long for the blood leads to decrease as it did for such blood levels to increase.

Further, a fetus that has been exposed to lead may be stillborn. The fetus may have a reduced birth weight and gestational age, and retarded cognitive development which may result in learning deficiencies and behavorial disorders. This is a significant and unreasonable risk of harm to the fetus. The fetal protection policy is necessary. The employer has carried its burden of "showing that the body of opinion believing that significant risk exists is so considerable 'that an informed employer could not responsibly fail to act on the assumption that this opinion might be the accurate one.'" *Wright,* 697 F.2d at 1191.

The next step to consider is whether the hazard does not apply to the offspring of male employees. In *Hayes,* the court stated, "[i]n those instances in which scientific evidence points to a hazard to women, but no scientific evidence exists regarding men, an employer may be allowed to adopt a suitable policy aimed only at women." 726 F.2d at 1549.

Expert opinion has been provided which holds that lead also affects the reproductive abilities of men and women. Some experts hold that these effects are as great as the effects of exposure of the fetus. Although the Court believes that men, women, and fetuses should be protected from lead exposure, there is expert opinion that fetuses are subject to a greater risk because the fetuses central nervous system is developing, and further, a fetus could be exposed to lead without the mother's knowledge. One legal writer has stated that "an employer may be justified in excluding all women of childbearing capacity from working with compounds that cause

reproductive injury to the female worker prior to her knowledge of pregnancy." Comment, *Gender Specific Regulations in the Chemical Workplace,* 27 Santa Clara L.Rev. 353, 370 (1987). Although adults of both sexes may be subject to equivalent susceptibility of reproduction hazards, a great body of experts are of the opinion that the fetus is more vulnerable to levels of lead that would not affect adults. The Court simply cannot overlook this possibility of severe harm only to the fetus. As a concern for society and future generations this Court must uphold the fetal protection policy. The fetus deserves special protection from lead. If women always knew when they were going to become pregnant, the mother could remove herself from the lead environment; this predictability does not always occur with accuracy. "Unlike abortion, in which a woman makes a knowing decision to end fetal life, workplace hazards may harm a worker's reproductive system on unborn offspring without his or her knowledge or consent." Timko, *Exploring the Limits of Legal Duty: A Union's Responsibilities With Respect to Fetal Protection Policies,* 23 Harv.J. on Legis. 159, 167 (1986). Because of the fetuses possibility of unknown existence to the mother and the severe risk of harm that may occur if exposed to lead, the fetal protection policy is not facially discriminatory.[5] Further, plaintiffs have failed to establish that there is an acceptable alternative policy which would protect the fetus. Perhaps with the improved development of pregnancy testing, an alternative may develop, but even if a pregnant woman is removed from lead exposure once she is aware of the pregnancy, the lead level does not decrease as quickly as it built up; lead remains in the body for some time. Thus, the fetus would be exposed to lead even if the mother is removed from the lead environment.

Additionally, based upon the affidavits submitted, it is apparent that the company is doing all that it can to reduce lead exposure levels to safe levels. Since 1978, the defendant has spent approximately 15 million dollars on environmental engineering controls in its Battery Division Plants. Although plaintiffs state that "in the opinion of Toxicologist Ellen Silbergeld, the technology exists to reduce blood lead levels below 15 micrograms," Ms. Silbergeld's deposition transcript reveals that she is not aware that there is technology which exists that would reduce blood lead levels at Johnson Controls to 12 micrograms. Plaintiffs have failed to demonstrate that acceptable alternative policies exist.

### B. Disparate Impact

Although the fetal protection policy is facially neutral, it has a disproportionate impact on women; thus, a prima facie case of disparate impact exists. The employers only defense in this situation is a business necessity defense, but "[o]ne problem with business necessity as defined under traditional Title VII analysis, but applied in the context of an employer's fetal protection program, is the requirement that the employer's policy be related to job performance because fetal protection does not in a strict sense have anything to do with job performance." *Hayes,* 726 F.2d at 1552. The *Hayes* court expanded the business necessity defense to cover the fetal protection case because "the defense in a fetal protection case is justified by a genuine desire to promote the health of employee offspring...." *Id.* at 1553. This Court agrees. There is a business necessity to protect fetuses. The fetus, from exposure to lead, faces a substantial risk of harm, and this exposure exists only for pregnant women. Men simply cannot expose a fetus to lead in the same way women can. The *Wright* court analogized fetuses to licen-

---

**5.** Because this Court has determined that the lead fetal protection policy is not facially discriminatory, this Court does not have to undertake a bona fide occupational qualification's (BFOQ) analysis. "Under traditional analysis, the BFOQ defense is available only when the employer can show that the excluded class is unable to perform the duties that constitute the

essence of the job, duties that Title VII defines as 'necessary to the normal operation of the particular business or enterprise.'" *Hayes,* 726 F.2d at 1549. Although not required to address, this Court merely notes that an employee's job performance would not be affected by pregnancy.

sees and invitees, and stated that "[c]ertainly the safety of unborn children of workers would seem no less a matter of legitimate business concern than the safety of the traditional business licensee or invitee upon an employer's premises." 697 F.2d at 1189. In view of the fact that a significant risk exists for fetuses exposed to lead, the fetuses safety cannot be ignored. A business would not expose its customers to lead. Furthermore, although not of primary importance, a business should be able to protect itself from future lawsuits which may arise because a child was prenatally exposed to lead. Thus, the business necessity defense applies to a lead fetal protection policy. There is a general societal interest in protecting the health of fetuses and children.

### C. Toxic Substance Control Act (TSCA)

Plaintiffs argue that although there is a societal interest in fetal safety, the obligation of protecting society's interest has been delegated to the Environmental Protection Agency in the TSCA. The TSCA requires producers of chemicals to report to the EPA information aboout substances which pose a substantial risk. The EPA is required to take regulatory action within 180 days after receiving information that a substantial risk may exist. If the EPA determines that a substantial risk exists, the EPA can regulate the substance. One commentator has criticized the effectiveness of the Act:

> Despite its broad scope, TSCA's useful-less in dealing with fetal toxins, teratogens, and mutagens has been limited. The EPA has substantial discretion under the statute, and the agency has tended to exercise this discretion to avoid active regulation. The EPA has announced that it intends to regulate at most two or three substances per year, with relevant studies taking up to two years per substance to prepare. The Office of Management and Budget under the Reagan administration has been relentless in criticizing the EPA's modest efforts to regulate dangerous chemicals. Consequently, fetal toxins, mutagens, and teratogens have escaped regulatory review.
>
> When the EPA does examine a chemical, it may consider the availability of substitutes and the economic consequences of regulation before making a pre-regulation determination that the chemical poses an "unreasonable risk." Furthermore, the promulgation of regulations involves consideration not only of their economic consequences but also of the available level of technology. A consideration of both these factors would probably lead to an acceptance of hazards that may not pose significant risks to employees but do pose grave risks to their unborn children.

Timko, *supra*, p. 16, at 172. Based upon the foregoing, the Court is not persuaded that the TSCA is protecting fetuses from lead exposure. Furthermore, eliminating the use of lead in battery production has not yet been achieved. The use of lead is still necessary at this point. The company is, however, continuing to "study, develop, and implement engineering controls to reduce the lead exposure and blood lead levels of all employees." Beaudoin Affidavit, ¶ 17. Although no evidence has been presented to the Court demonstrating that the EPA has reviewed the lead situation at issue here, it is unlikely that the EPA would prevent the use of lead in the absence of a substitute. Further, because the TSCA is gender neutral, it would fail to protect the fetus which faces a significant risk from lead exposure because male and female are treated equally under the Act.

### IV. Conclusion

Society has an interest in protecting fetal safety. Lead poses a substantial risk of harm to the fetus. This risk is born only by women who are pregnant or will become pregnant. The plaintiffs have not shown that there is an acceptable alternative that would have a lesser impact on females. Johnson Controls fetal protection policy does not violate Title VII. Stillbirths, reduced birth weight and gestational age, and retarded cognitive development are abnormalities too serious for this Court to find unimportant.

318

Defendant's motion for summary judgment is hereby GRANTED.