**Pat L. GRANT, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, et al., Defendants.**

No. C88–7511.

United States District Court, N.D. Ohio, W.D.

April 26, 1989.

1990); *Snyder v. Holy Cross Hospital,* 30 Md. App. 317, 352 A.2d 334 (1976).

allow the plaintiff to work as an iron pourer or to license her as a hot metal crane operator because she is a female capable of bearing children. GM concedes for purposes of argument that Grant was otherwise qualified and entitled to perform these jobs, but GM maintains that its fetal protection policy does not violate Title VII or the Equal Pay Act.

Since 1952, GM has prohibited women capable of bearing children from working in jobs where there is a potential exposure to lead. Over the years, this policy has been revised in light of medical evidence and conditions at GM's factories. The policy is currently enforced by the plant medical director at the Defiance foundry.

The policy is only applied to women who are capable of bearing children. If a female employee provides proof that she is unable to bear children, her work assignments will not be restricted by the fetal protection policy. Nor are male employees subject to the restrictions of the policy.

If a woman capable of bearing children is working in an area with a detectable level of lead in the air of ten micrograms per cubic foot (10 ug/m$^3$) or greater, she will be interviewed by the plant medical director. The employee will be advised that there is no health hazard to her, but if she becomes pregnant, there may be a hazard to the fetus she carries. She is encouraged to accept a transfer to a job without lead exposure.

If the employee refuses to transfer to another job, she will be required to submit to a blood level analysis before beginning a job with lead exposure. She will be tested every two months while she is on the job, and she must wear a respirator at all times while on the job. The maximum permissible blood concentration for a female capable of bearing children is 20 micrograms per deciliter of whole blood (20 ug/100 gms). If her blood test indicates blood lead levels greater than 20 ug/100 gms, the blood test will be repeated within ten days. If the results of the second test are still greater than 20 ug/100 gms, the employee will be permanently transferred to a work

Sharon L. Griffin, Toledo, Ohio, for plaintiff.

Michael S. Scalzo, Richard M. Kerger, Marshall & Melhorn, Toledo, Ohio, for defendants.

## OPINION AND ORDER

McQUADE, District Judge.

This cause is before the court on defendants' motion for summary judgment.

The plaintiff, Pat L. Grant, commenced this suit alleging that the defendants, General Motors Corporation and various individual supervisory and management employees at General Motors Central Foundry facility at Defiance, Ohio [hereinafter collectively referred to as "GM"], violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the Equal Pay Act, 29 U.S.C. § 206(d). The nature of the plaintiff's complaint is that in applying GM's fetal protection policy, GM refused to

assignment with no detectable lead exposure.

Under no circumstances will any female capable of bearing children be permitted to work in an environment where the air lead level is in excess of 30 micrograms per cubic foot of air (30 ug/m³).

The defendants have submitted the affidavit of Sydney I. Lerner, M.D., as evidence of the possible medical hazards posed by exposure to lead. Dr. Lerner is a specialist in occupational medicine who has, since 1962, served as a consultant in designing health programs, training workers, teaching medical residents, and researching the health care of workers who are exposed to lead. Dr. Lerner is well qualified to speak to the hazards of exposure to lead given his extensive experience in the area. According to Dr. Lerner, recent health studies have concluded that a fetus whose mother has been exposed to lead will experience decreased mental development, intellectual and motor retardation, behavioral abnormalities, and deficiencies in learning abilities. The decreased mental development in infants is caused by exposure to lead as fetuses, not post-natal exposure to lead. The exact blood lead level at which there is a significant effect on the fetus is not known, but Dr. Lerner states that based on current medical knowledge, to a high degree of medical certainty, one can say that ten micrograms is the highest acceptable level.

During pregnancy, the lead in the mother's blood transfers across the placenta to the fetus. The fetus' blood lead level is approximately the same as that of the mother at the time of delivery. Measuring the blood lead level of the mother is the only method to estimate the blood lead level of the fetus.

Dr. Lerner states that there are no studies that show that the exposure of a male to blood lead levels of up to 50 micrograms will result in abnormalities in his children. The available medical evidence does not indicate that high levels of lead exposure cause any change in a man's sperm that could be transmitted to his child and cause any abnormality in his child's development.

According to Dr. Lerner, lead toxicity in an adult is to a large degree reversible or likely to be reversible. While lead exposure of up to 30 to 50 micrograms is not likely to produce any significant adverse effects in adults, these levels create a substantial risk of irreversible neurological damage to a fetus. Dr. Lerner is aware of GM's fetal protection policy, and concludes that is medically justifiable.

The plaintiff has filed her own affidavit in which she states: "I have amassed a wealth of scientific and legal data and literature concerning [workers' exposure to lead]. I have studied same long and carefully, and have well-educated myself in this specialized field." She cites several sources, asserting that they stand for the proposition that exposure of males to high levels of lead will cause sperm changes and decreased fertility in the men and increased fetal and infant deaths among their offspring. None of these sources, however, has been submitted for the court's consideration.

Summary judgment is appropriate when the moving party shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

In deciding a motion for summary judgment, the court will view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). The non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In *Wright v. Olin Corp.*, 697 F.2d 1172, 1189 (4th Cir.1982), the Fourth Circuit con-

cluded that "under appropriate circumstances an employer may, as a matter of business necessity, impose otherwise impermissible restrictions on employment opportunity that are reasonably required to protect the health of unborn children of women workers against hazards of the workplace." In reaching this conclusion, the court determined that the proper analysis for judging whether a fetal protection policy violates Title VII is disparate impact analysis. The court found that a fetal protection policy that restricts employment opportunities of only women presents a *prima facie* case of disparate impact. Once a *prima facie* case is established, the employer may rebut by presenting a business necessity for the fetal protection policy. The court outlined several principles to guide a court in determining whether the business necessity defense has been established.

First, the employer must show that there is a significant risk of harm to the unborn children of female employees from their exposure to lead in the workplace such that female employees, but not male employees, may be restricted from exposure to lead, and that the employer's program of restriction is effective for that purpose. Second, the employer must present independent, objective evidence that the significance of the risk, the extent to which it is confined to unborn children of women, the necessity of applying protective restrictions to female employees, and the effectiveness of the restriction justify the fetal protection policy. Third, findings and conclusions establishing the business necessity defense must be supported by the testimony of qualified experts in the relevant scientific fields. It is not necessary, however, to prove a general consensus within the qualified scientific community. It is sufficient to show that within the community, there is a considerable body of opinion that the risk exists, and that it is substantially confined to female workers. Finally, the court concluded that an employer has set forth a *prima facie* business necessity defense where the employer has submitted proof of the degree of the risk of harm and of the effectiveness of the challenged policy.

In the final stage of disparate impact analysis, the plaintiff may rebut the defendant's business necessity defense by proof that there are acceptable alternative policies which would better accomplish the business purpose or accomplish it equally well with less of an impact on female employees. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2790, 101 L.Ed.2d 827 (1988).

The Fifth Circuit examined a similar issue in *Zuniga v. Kleberg County Hospital*, 692 F.2d 986 (5th Cir.1982). Zuniga, a female x-ray technician, sued the hospital for violation of Title VII when the hospital fired her when she became pregnant. The hospital's decision was based solely on concern over the possible effects of exposing the fetus to x-ray radiation. The Fifth Circuit applied disparate impact analysis and concluded that "Zuniga has effectively revealed the alleged business necessity to be a mere pretext for discrimination by showing that the Hospital failed to utilize an available, alternative, less discriminatory means of achieving its business purpose." *Id.* at 992. *Accord Hayes v. Shelby Memorial Hospital*, 726 F.2d 1543, 1552–54 (11th Cir.1984).

In applying these legal standards to the facts of the case before it, the court concludes that GM's fetal protection policy is able to withstand a Title VII challenge. First, GM has presented the testimony of a qualified expert that there is a significant risk of harm to the unborn children of female employees from their exposure during pregnancy to lead in the workplace. GM has also presented sufficient scientific evidence that there is no significant risk of harm to the unborn children of male employees from their exposure to lead in the workplace. Second, GM has demonstrated that its policy is an effective means of *reducing* the amount of lead to which a woman capable of bearing children is exposed. If a woman works in an area where the detectable level of lead in the air is between ten micrograms per cubic foot (10 ug/m³) and thirty micrograms per cubic foot (30 ug/m³), she must wear a respirator and have her blood lead level checked regu-

larly. If her blood lead level exceeds twenty micrograms per deciliter of whole blood (20 ug/100gms), she will be assigned to a job with no detectable lead exposure. A woman capable of bearing children is not permitted to work in an area where the detectable level of lead in the air is greater than thirty micrograms per cubic foot (30 ug/m $^3$). Based on the medical testimony that ten micrograms per deciliter of whole blood (10 ug/100gms) is the highest acceptable blood lead level for a pregnant woman, GM's restrictions are an effective means of protecting the fetuses carried by its female employees from exposure to lead.

The plaintiff's affidavit contains references to publications suggesting that there is a significant risk of harm to the unborn children of male employees who are exposed to lead in the workplace, but because the plaintiff is not qualified to testify as an expert to the effects of exposure to lead, and because the content of the publications referred to in her affidavit is not before the court, the court must conclude that the plaintiff has failed to show that there is a genuine issue of material fact regarding the scientific and medical data which forms the basis of GM's fetal protection policy. Therefore, the plaintiff has failed to show that GM does not have a legitimate business justification for its fetal protection policy.

Finally, the plaintiff has failed to submit any evidence that there is an alternative means of satisfying GM's business necessity without the same discriminatory effects. The defendant's motion for summary judgment as to the Title VII claim must be sustained.

■ The plaintiff's Equal Pay Act claim is based on her allegations that she lost $1,560.00 in regular wages and $6,123.00 in overtime wages when she was removed from her position as iron pourer, and that she lost $1,320.00 in regular wages and $32,000.00 in overtime wages when GM refused to license her as a hot metal crane operator. She conceded in her deposition that she was always paid the same wage as her male counterparts working the same job or in the same job classification.

The plaintiff's allegations do not properly raise an Equal Pay Act claim. The statute prevents, with four exceptions, an employer from paying a woman less than a man who performs the same job. *See* 29 U.S.C. § 206(d). To make out a case under the Equal Pay Act, the plaintiff must show that her employer pays different wages to male and female employees "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Id. See also Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). The plaintiff has conceded that she received the same pay as males working the same job or job classification. Grant Deposition at 109–10. That she would have been paid more as an iron pourer or hot metal crane operator, and that she was denied those positions as a result of GM's fetal protection policy, do not raise Equal Pay Act issues. Therefore, there is no genuine issue of fact as to the material element of an Equal Pay Act claim, and GM is entitled to summary judgment on that claim.

It is therefore

ORDERED that the defendants' motion for summary judgment is sustained;

FURTHER ORDERED that this cause is dismissed.